620 So.2d 453 (1993)
Kenneth D. BAUDOIN, et al., Plaintiff-Appellant,
v.
ACADIA PARISH POLICE JURY, et al., Defendant-Appellee.
No. 92-397.
Court of Appeal of Louisiana, Third Circuit.
June 9, 1993.
*454 Sue Fontenot, Abbeville, for Kenneth D. Baudoin et al.
Carol Stookey Hunter, Charles E. Soileau, Rayne, for Acadia Parish Police Jury, et al.
*455 Maurice Blake Monrose, George Robert Privat, Lafayette, for Medus & All America Ins.
Before DOMENGEAUX, C.J., DOUCET, YELVERTON and WOODARD, JJ., and CULPEPPER[*], J. Pro Tem.
YELVERTON, Judge.
This is an action brought against the Acadia Parish Police Jury for damages resulting from an intersectional collision allegedly caused by its failure to maintain a stop sign and its failure to eliminate weed and foliage obstructions to view at the intersection. The trial court found no fault on the part of the police jury, and dismissed the action. The plaintiffs appealed. We reverse and award damages.
On the afternoon of June 30, 1989, Joy Grayson, her son Joshua Grayson, her brother Jeremy Baudoin, and her boyfriend David Wolf were coming from Texas heading towards Maurice, Louisiana, for a family reunion. Wolf drove from Texas and Grayson began driving in Jennings.
The car Grayson was driving was going north on Acadia Parish Road 1-19. It collided at an intersection with a car driven east by Karen Medus on Acadia Parish Road 1-18. As a result of this collision, both Grayson and her son were killed and the other two passengers, Jeremy Baudoin and David Wolf, were injured.
Kenneth Baudoin and Christine Baudoin, the parents of Jeremy, filed suit on behalf of Jeremy against the Acadia Parish Police Jury. Christine Baudoin, mother of Joy Grayson and grandmother of Joshua, sued for the loss of her daughter and her grandson. Wolf sued for his damages.

FAULT
At the intersection, there was a stop sign for traffic traveling north on 1-19. The intersecting road, 1-18, was the favored road. Grayson had the stop sign. The Medus vehicle had no stop sign.
The parish erected the stop sign and had a duty to maintain it. Briggs v. Hartford Insurance Company, 532 So.2d 1154 (La.1988). The plaintiffs in this case contended that the sign was so old and faded that it no longer served its purpose.
The trial judge, in oral findings of fact, recognized that the sign at the intersection was faded, but felt that it was adequate. He found Grayson was traveling 20 miles an hour when she entered the intersection. The trial judge then stated: "[T]he law is the greater the obstruction to vision, the greater the responsibility on that driver to approach the intersection very cautiously." The trial judge found that she was probably lost, but that that did not excuse not stopping for the stop sign. The trial judge found that it was gross negligence for Grayson to drive into the intersection without stopping. The trial judge found that the cause of this accident was Grayson's failure to stop and assessed her with 100% of the fault for the accident.
The trial court's reasoning suggests that it believed the parish owed no duty to imprudent motorists. Our Supreme Court has said otherwise. Burge v. City of Hammond, 494 So.2d 539 (La.1986); Ledbetter v. State, Dept. of Transp. & Dev., 502 So.2d 1383 (La.1987).
After reviewing the record, we find that the trial judge was clearly wrong in his legal conclusion that the parish owed no duty to an imprudent motorist, and in his factual finding that the sign was adequate.
Grayson was a stranger to the area and did not know where she was going. The only person who knew the direction to take was asleep in the car. It was raining. Although the stop sign itself was not obstructed by weeds or other vegetation, the intersecting road could not be seen from either side. Therefore, the presence and visibility of the stop sign was critical to alert the unfamiliar driver with the need to stop for favored traffic.
*456 Dr. Olin Dart, an expert in traffic engineering, traffic safety, and accident reconstruction, reviewed the accident and the site. His opinion was that the stop sign at the intersection was totally inadequate. He explained that a stop sign conveys its message by three methods, a redundancy built into every sign: its shape, color, and message. This stop sign was totally useless in its color and message. The color of the sign was gone and one could not read the message until very close to it. He felt the sign had long outlived its useful life. The reflecting sheet that was put on it was worn out. He also found the sign was at an angle and with the rainy conditions on that day, it may have been difficult to see its octagonal shape. The stop sign is the only sign that is octagonal in shape for the added element of identification. He also stated that a normal reflective sign lasts about seven years and he estimated this one was twenty-years-old. The sign did not attract attention.
Trooper Randy Leger who investigated the accident was shown a video tape of the scene. He recognized the sign and said that it was in the same condition then as it was on the day of the accident. He recognized that the color was faded and that there was something painted on it.
We have reviewed this videotape. It was taken on the approach to the intersection as Grayson would have been looking.
The videotape confirms Dr. Dart's opinion that the sign is hardly recognizable as a stop sign. Superimposed on its faded red and white original colors was blue paint applied in five stripes from the center out in a spoke fashion. Apparently, this blue paint, which is also faded, was put there by a vandal. The blue spokes detract from the function of the sign to call attention to its octagonal shape. The fading of the sign's colors is so complete that the word "STOP" blends into the background and is nearly invisible until close up.
Aaron Hornsby, Parish Road Supervisor for the Police Jury, testified that at the time of the accident there was a sign man who would inspect and replace parish roadway road signs as they were needed. It usually took him one month to inspect all the roads in the parish. Hornsby examined the site after the accident and admitted that the sign was so faded that it was time it be replaced.
It was clear error to place 100% of the fault on Grayson. Rosell v. ESCO, 549 So.2d 840 (La.1989). If the stop sign had been in a condition to attract attention to it, then it is probable that Grayson would have seen it and stopped. Perhaps Grayson could have seen the sign in time to stop had she been more attentive, had she not been lost, and had it not been raining. However, the parish's duty to maintain its roads in a reasonably safe condition is owed to imprudent motorists as well as non-negligent ones. Burge v. City of Hammond, supra.

APPORTIONMENT OF FAULT
Having determined that the trial judge's allocation of 100% fault to Grayson was against the weight of the evidence, and was clearly wrong, we now exercise our authority under La.C.C.P. art. 2164 to render a judgment which is just, legal, and proper upon this record.
Applying the guidelines of Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), in apportioning fault, we find that the Police Jury was 50% at fault for its failure to provide an adequate sign for the intersection, and Grayson was 50% at fault for failure to see the sign in time to stop.
Before we review the record and determine the damages that are proper under the circumstances of the case, we must first discuss the assignment of error dealing with the survival and wrongful death actions. Plaintiffs claim that the trial court erred in granting the Acadia Parish Police Jury's exception of no right of action dismissing Christine Baudoin's claims as to Joshua and Joy Grayson.
The trial judge found that Christine Baudoin, as Joshua's grandmother, did not inherit Joshua's survival and wrongful death actions arising from the death of his mother. The reason for this ruling was that *457 Christine did not prove that Joshua's natural father was dead.
The burden of proof as to this issue was not Christine's. When a defendant challenges a plaintiff's right of action on the basis that the plaintiff's claim as the deceased's mother is excluded by the existence of a child of the deceased, the defendant has the burden of proving by clear and convincing evidence that the child was the child of the deceased. Chatelain v. State, DOTD, 586 So.2d 1373, 1378 (La. 1991). That burden of proof rule should apply equally in the circumstances of the present case. It was the Police Jury which challenged the grandmother's claim by attempting to establish the existence of a primary beneficiary, the child's natural father, as a survivor with a preferential entitlement under La.C.C. art. 2315. Thus it had the burden of proving that the child's natural father was alive and had the right to inherit from the child. A parent, according to La.C.C. art. 891, is one who is legitimately filiated to the deceased or who is filiated by legitimation or by acknowledgment under Article 203 or by judgment under Article 209 or who has openly and notoriously treated the child as his own and has not refused to support him. The Police Jury offered no proof that the natural father was alive and had the right to inherit from the child.
All we know of the father from the record before us is that he may be a person named Steve. The Police Jury failed to prove that the child's natural father had a right to inherit under the requirements set forth in La.C.C. art. 891. Therefore, the child's grandmother inherited Joshua's rights arising from the death of his mother, under La.C.C. art. 895, and the exception of no right of action to this extent is overruled.
Plaintiffs also claim that Christine inherited Joshua's right to recover for his pain and suffering prior to his death, but admit she does not have a wrongful death action because a grandmother is not listed by La.C.C. art. 2315.2 as one of the class of beneficiaries entitled to pursue the action. Since Joshua died, the right to recover for Joshua's pain and suffering is known as a survival action under La.C.C. art. 2315.1. Grandmothers are not listed in the class of beneficiaries entitled to bring a survival action, so Christine, in her capacity as the grandmother of Joshua, had no right to bring an action for Joshua's pain and suffering prior to his death. This portion of the trial court's ruling was correct.

DAMAGES
Except as to the exceptions of no right of action, the appellee's brief did not address the subject of damages.
We will address the subject of damages in the light of the evidence, taking up each plaintiff's claim individually.

David Wolf
He was a passenger in Joy Grayson's car. He and Joy had been living together for seven years. He testified they planned to marry the next Christmas day.
Wolf was in the front seat asleep. He was shaken up in the accident and pretty well bruised. The record reveals that Wolf had medical bills totalling $3,178.77. He testified they were related to the accident. There was no contradictory evidence. We therefore award this amount to Wolf as damages for medical expenses.
Wolf also claimed that he suffered lost wages as a result of this accident. Before the accident he was employed by Williams Brothers Construction making $9.75 an hour at 40 hours a week. About a month after the accident, he returned to work. However, he left the job a week and a half later because, according to his testimony, he "could not handle what happened in his life."
We award Wolf the wages he lost for the month he did not go back to work. For four weeks at 40 hours a weeks at the rate of $9.75, this totals $1,560.
Wolf also claimed that he suffered lost wages because he was not able to return to work for three years after he left the job. He blamed this on mental problems due to Grayson's death and the death *458 of her son, which he testified gave him high blood pressure. The only evidence with regard to these alleged consequences of the accident was Wolf's own testimony.
Mental trauma requires more substantial evidence than just the victim's selfserving testimony. Kolder v. State Farm Ins. Co., 520 So.2d 960 (La.App. 3d Cir. 1987). We find that Wolf has failed to prove with competent evidence that he suffered mental trauma which prevented him from returning to work.
Wolf suffered no permanent physical injuries from the accident. He was able to leave the hospital after three days. An award of $5,000 will fully compensate him for his pain and suffering.

Jeremy Baudoin
Jeremy's injuries resulted in a total of $18,431.04 in medical expenses.
Testimony by the doctors who treated Jeremy at the Rayne-Branch Hospital, where he was taken by ambulance after the accident, described his injuries. He had collapsed lungs, an open fracture of the left tibia and the fibula, bilateral rib fractures, lacerations on the forehead, and extensive bruising. Chest tubes were inserted into each lung by using a local anesthetic and making an incision in the side of the chest. The doctors testified that he was in a great deal of pain for several days. He had difficulty breathing and because of this could not take anesthetics.
After Jeremy was transferred to Lafayette General Hospital, surgery was performed on his leg by Dr. Gregory Gidmon, an orthopedic surgeon. After surgery, he was placed in a long leg cast for six weeks. He was on crutches for several months. Dr. Gidmon stated that Jeremy would have a 10% impairment because of the fracture, and that one leg was a little shorter than the other.
Jeremy testified that it felt like a knife was being dragged through his body when they inserted the tubes in his lungs. Initially he had to use a wheelchair instead of crutches to move around because his chest hurt from the collapsed lungs and rib fractures. His leg was in pain for several weeks. He has a number of permanent scars. He missed a year of physical education and extracurricular activities in his school.
After a review of this evidence, we find that Jeremy suffered general damages in the amount of $125,000.
Jeremy's parents also claim loss of consortium damages as a result of Jeremy's injuries.
The loss of consortium includes such pecuniary elements as loss of services, and such non-pecuniary components as love, companionship, affection, society, comfort and solace. Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144 (La.App. 3d Cir.), writ denied, 565 So.2d 450 (La. 1990).
While we find that the Baudoin's activities with Jeremy may have been restricted for a little while and Jeremy's mother may have had to care for her son a little more than usual, we do not find that their relationship with Jeremy was adversely affected. There is no testimony from Jeremy's father that his relationship with his son was affected. We find that an award of loss of consortium under these circumstances is not warranted.

Joshua's Survival and Wrongful Death Actions
Since we have determined that Joshua's grandmother inherited his survival and wrongful death actions for his mother, we must determine the worth of these damages.
Christine was unable to prove damages in the survival action. In Malmay v. Sentry Ins. Co., 550 So.2d 366 (La.App. 3d Cir.1989), we recognized the law to be that if it is shown that a person was probably unconscious when she suffers fatal injury, survivors are not entitled to recover for the deceased's pain and suffering.
The evidence in the record reveals that Grayson was probably unconscious after the accident. Wolf testified that Grayson was unconscious after the accident and her complexion was very white. He stated she was not making any noises. Trooper Leger *459 testified that although Grayson was moaning, she was not responsive and had a gray color.
The record does not support a finding that Joshua was entitled to recover for Grayson's pain and suffering. Therefore, Christine inherits nothing from Joshua for his mother's survival action.
The elements of damage for wrongful death are loss of love, affection and companionship, loss of support, and funeral expenses. The measure of damages for loss of love, affection and companionship is analogous to that for pain and suffering; that is, there must be an awareness of the loss by the deceased before he dies and a consideration by the trier of fact of the duration of the anguish. Wakefield v. Government Employees Insurance Co., 253 So.2d 667 (La.App. 4th Cir.1971), writ denied, 260 La. 286, 255 So.2d 771 (1972); Walker v. St. Paul Ins. Companies, 339 So.2d 441 (La.App. 1st Cir.1976), writ granted for other reasons, 341 So.2d 554 (La.1977), on remand 343 So.2d 251 (La. App. 1st Cir.1977).
In the present case Joshua died from head injuries a few hours after his mother. Trooper Leger testified that Joshua was never conscious in his presence. There is no evidence that Joshua regained consciousness and learned of his mother's death.
The value of an inherited right of action must be the amount the surviving beneficiary was entitled to receive from the time of death of the tort victim until the time of the beneficiary's death, at which time the right of action is inherited by the beneficiary's heirs. Wakefield, supra. Under these facts, there is no measurable damage for loss of love, affection and companionship, and loss of support, since Joshua died at 3:12 the morning after the accident.
His mother's medical bills and funeral expenses were incurred before Joshua's death, and Christine is therefore entitled to recover $1,079.75 for medical expenses and $5,139.91 for Joy Grayson's funeral expenses.

JUDGMENT
For the reasons assigned, the judgment rejecting the plaintiffs' demands is reversed and set aside. Judgment is rendered allocating Joy Grayson with 50% of the fault and Acadia Parish Police Jury with 50% of the fault. Judgment is rendered recognizing the damages of David Wolf to be $9,738.77, of Jeremy Baudoin, $143,431.04, and of Christine Baudoin, $16,219.66. Judgment is rendered against the Acadia Parish Police Jury and in favor of David Wolf for $4,869.39; in favor of Kenneth and Christine Baudoin, on behalf of Jeremy Baudoin, for $71,715.52; and in favor of Christine Baudoin for $3,108.83. All awards will bear legal interest from judicial demand. All costs in the trial court as well as the costs of this appeal are assessed one-half to plaintiffs and one-half to defendant.
REVERSED AND RENDERED.
DOUCET, J., dissents, finding no clear error in the trial court's findings of facts.
WOODARD, J., dissents from the majority's allocation of faults and damages and assigns written reasons.
WOODARD, Judge, dissenting in part.
I agree with the findings of the majority in all respects except for apportionment of liability and damages regarding the survival action.
I would apportion one hundred (100%) percent fault to defendants and no fault to Ms. Grayson, for the following reasons:
"It is well settled that a governmental authority that undertakes to control traffic at an intersection must exercise a high degree of care for the safety of the motoring public." Briggs v. Hartford Insurance Company, 532 So.2d 1154, 1156 (La.1988), quoting Gaspard v. Stutes, 380 So.2d 201, 204 (La.App. 3 Cir.1980).
To exercise same, the parish has a duty to maintain its roads in a reasonably safe condition for all motorists, even including those who might be imprudent. (That is not to suggest that Ms. Grayson was imprudent). *460 That duty encompasses the most important directive, "stop", which is obviously there to prevent people from colliding with each other.
In order for any driver to respond to a directive, he or she must "get the message" it is intended to convey. First, the sign must get his or her attention. Then, the driver has to be able to read what it says from a distance, while operating a moving vehicle, while watching speed, while watching for other drivers and while watching the road. Obviously, a driver's attention must be divided in many directions. Dr. Dart, an expert in traffic engineering, testified that a stop sign must have all of the following characteristics in order for a driver to "get the message": shape, color and message. Common sense also dictates that position is important. To be effective, a stop sign must be in a close proximity to the road so that a driver can pick it up quickly without having to divert his eyes too far from the roadway.
It is estimated that the sign in the case, sub judice, was approximately twenty (20) years old. Dr. Dart testified, and the videotape confirms, that the red color was virtually gone, the message could not be read until very close to it, its reflecting sheet was worn out, and it was at an angle. Indeed, even the Parish Road Supervisor for the Police Jury admitted that the sign was so faded it needed to be replaced. I submit that if the sign were doing its job, why did it need to be replaced?
Dr. Dart opined that because of the angle, on a rainy day, it even may have been difficult to see its octagonal shape, which only a stop sign has.
Further, it appears from the videotape that blue spokes were painted across the front of the sign, and that the word "stop" blended into the sign's background. This made "the message" nearly invisible until close up. The videotape shows that the message is further obscured because, from the perspective of an approaching vehicle, the sign itself blends into the colors of the landscape and that even its post is not easily discernible due to the fact that it is not on the corner of the intersection directly in front of the driver. It is across a ditch away from the road. All an approaching vehicle can see is what appears to be an unremarkable post, just another object in the overgrown terrain. If there were any reason that a driver would know to look for this "sign", by the time he could figure out what it says, it would be too late to obey its directive. Ms. Grayson was from Texas, unfamiliar with this rural road, and the intersecting road, where she was killed, was made invisible by extremely thick, tall grass. Surely, she had every right to expect that if at some point she was suppose to stop, there would be a proper, timely instruction to that effect. We must presume that if the intersection had been properly marked, Ms. Grayson would have observed and obeyed the directive. Willis v. Everett, 359 So.2d 1080 (La.App. 3 Cir.1978), writ denied, 362 So.2d 800 (La.1978); Funderburk v. Temple, 268 So.2d 689 (La.App. 1 Cir.1972), writ refused, 270 So.2d 875 (La.1973). Additionally, when a person is killed in an accident and, therefore, is unable to testify on his or her own behalf, there is another presumption which may be invoked to negate contributory negligence. "[T]he law presumes, because of the instinct of self preservation and love of life, that the decedent was not negligent and acted with ordinary care for his or her own safety." Benoit v. Hartford Casualty Insurance Company, 478 So.2d 707, 710 (La.App. 3 Cir.1985), writ denied, 480 So.2d 745 (La.1986). To my knowledge, ordinary care is all that is required.
Based on all of the foregoing, it appears that, more probably than not, Ms. Grayson was free from fault in causing her death and that the sole cause of it was the police jury's breach of its duty.
I further respectfully dissent from the majority regarding its determination that, due to Ms. Grayson's "probable" unconsciousness after the accident, Ms. Baudoin was unable to prove damages in the survival action she inherited.
The police officer, who was at the scene after the accident, testified that Ms. Grayson was moaning. Moaning in these circumstances, *461 is usually associated with pain. Given the trauma she had just experienced, we can only surmise the extreme physical and emotional pain Ms. Grayson was, more probably than not, suffering. Notwithstanding, the trial court may award damages for pain and suffering, even in the absence of evidence that the deceased regained consciousness after the accident. Cheatham v. City of New Orleans, 378 So.2d 369 (La.1979); Brown v. Department of Transportation, 604 So.2d 99 (La.App. 3 Cir.1992). Such appears appropriate in the case sub judice.
NOTES
[*] Honorable William A. Culpepper participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.