702 So.2d 1024 (1997)
Carolyn J. HAYNES, Individually and on Behalf of her minor son, Bill Haynes, Stephanie Haynes Lambert and Deena E. Haynes, Plaintiffs-Appellees.
v.
CALCASIEU MEDICAL TRANSPORTATION, INC., M. Soileau and Bryon P. Ledet, Defendants-Appellants.
No. 97-300.
Court of Appeal of Louisiana, Third Circuit.
October 29, 1997.
Rehearing Denied January 8, 1988.
*1026 Kenneth D. St. Pé, for Carolyn J. Haynes, et al.
Henry Eugene Yoes, III, Bernard Hugh McLaughlin, Jr., Lake Charles, for LifeCare Ambulance Service & Hermitage Ins. Co.
Before DOUCET, C.J., and THIBODEAUX and DECUIR, JJ.
DOUCET, Chief Judge.
The defendants, LifeCare Medical Emergency Services, Inc. and its insurer, Hermitage Insurance Company, appeal a judgment rendered pursuant to a jury verdict, finding them liable for a heart attack victim's loss of a chance of survival.

STATEMENT OF FACTS
On May 12, 1994, Bill Haynes began feeling chest pains. His son, Bill, Jr., called his sister, Stephanie, a nursing student. Stephanie arrived a short time later and took Mr. Haynes' blood pressure. The reading was such that she told her mother to call an ambulance. When the ambulance arrived, the attendants, Bryan Ledet and Michael Soileau, attempted to enter by the kitchen door with a stretcher. The attendants felt the stretcher would not fit through the kitchen. Therefore, Soileau went around to the front door with the stretcher while Ledet entered through the kitchen equipped only with a stethoscope. Mr. Haynes at first resisted the attendants' attempt to get him to go in the ambulance to the hospital, then acquiesced. Mr. Haynes rose from his chair, took a step or two and collapsed. Ledet sent Soileau to bring in the equipment from the ambulance. Ledet determined that Mr. Haynes was in ventricular fibrillation and attempted to defibrillate him using a portable defibrillator brought in from the ambulance. In spite of several attempts, the defibrillator would not deliver the charge. The ambulance attendants began CPR, oxygen and *1027 medications both orally and intravenously. After twenty minutes to half an hour on the scene, Mr. Haynes was taken to DeQuincy Memorial Hospital. At the hospital, the staff attempted to defibrillate Mr. Haynes. However, they were never able to restore a normal heart rhythm. Mr. Haynes was pronounced dead a short time after entering the hospital.
Mr. Haynes' widow, Carolyn J. Haynes, and her children filed this suit, seeking damages for wrongful death, survival, lost chance of survival, and mental anguish. The defendants answered the petition and brought a third party demand against the manufacturer of the defibrillator, Physio-Control. The plaintiffs added Physio-Control as a defendant. All claims against Physio-Control were later voluntarily dismissed.
The case was tried by a jury. After hearing the evidence, the jury returned a verdict finding no negligence on the part of either ambulance attendant. The jury did find that Bill Haynes lost a more than 50% chance of survival entirely as a result of negligence on the part of LifeCare. As a result, the jury awarded damages for wrongful death. Carol Haynes, the decedent's widow, was awarded $75,000.00 for loss of love, affection and companionship and $25,000.00 for mental anguish, grief and emotional distress. Bill, Jr., the decedent's minor son, was awarded $50,000.00 for loss of love, affection and companionship and $25,000.00 for mental anguish, grief and emotional distress. Deena Haynes and Stephanie Lambreth, the decedent's major daughters, were each awarded $20,000.00 for loss of love, affection and companionship and $15,000.00 for mental anguish, grief and emotional distress.
LifeCare and Hermitage appeal the judgment. The plaintiffs have answered the appeal.

ISSUES FOR REVIEW
The issues presented by this appeal are: 1) whether Haynes lost a chance of survival, 2) the percentage chance lost, if any, 3) who was at fault in causing Haynes to lose a chance of survival? 4) whether the ambulance attendants should have been assessed with fault, 5) whether the decedent and or his family members should have been assessed with fault, and 6) the quantum of damages. After reviewing the evidence adduced at trial and the applicable law, we find that the jury did not err in finding that Haynes lost a more than fifty percent chance of survival as a result of the sole negligence of LifeCare and that the damages awarded were neither inadequate nor excessive.

STANDARD OF REVIEW
The assignments of error raised by the parties deal essentially with findings of fact made by the jury and/or the trial judge. The standard of review to be applied to jury verdicts has been set out by the Louisiana Supreme Court in Guillory v. Insurance Company of North America, 96-1084, p. 5 (La.4/8/97); 692 So.2d 1029, 1032:
In a trial where causation and credibility are major issues, a jury's findings of fact are entitled to great deference. Ambrose v. New Orleans Police Ambulance Service, 93-3099, 93-3110, 93-3112 (La.7/5/94); 639 So.2d 216; reh'g denied, 9/15/94. Those findings may not be overturned unless they are manifestly erroneous. Stobart v. State, 92-1328 (La.4/12/93); 617 So.2d 880. Moreover, when more than one competing view is permissible, as in this case, a fact finder's choice cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989), writ denied, 561 So.2d 105 (La.1990).
Before reversing a jury's conclusions of fact, an appellate court must satisfy a two step process based on the record as a whole: There must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. Stobart v. State, 92-1328 (La.4/12/93); 617 So.2d 880; Weatherford v. Commercial Union Ins., 94-1793, 94-1927 (La.2/20/95); 650 So.2d 763.
This being the standard of review, we will consider the issues raised by the parties.

LOSS OF CHANCE OF SURVIVAL

Was Haynes' condition one that could have been helped by defibrillation?
The defendants assert that the plaintiffs have failed to prove that Haynes lost a chance of survival. They argue that the *1028 plaintiffs failed to show that Haynes had any chance of survival at the time of his collapse because they did not prove what caused his death. Defendants argue that determining the cause of death is a necessary precedent to determining whether defibrillation could be expected to alleviate the condition and thus whether failure to defibrillate could be considered a cause in fact of a loss of a chance of survival.
Dr. Chris Mandry testified on behalf of the defendants as an expert in the field of emergency medicine. He testified that if Haynes was suffering from a pulmonary embolism, cardiac dissection, pericarditis or esophageal perforation rather than myocardial infarction, he would have exhibited the same symptoms but that defibrillation would not have helped him.
However, Dr. Carl Luikart, a cardiologist, opined that Haynes was suffering from either myocardial infarction, an acute ischemic process, unstable angina or angina. Dr. Luikart was definitely of the opinion that Haynes was in ventricular fibrillation and would have benefited from defibrillation. In fact, he stated that without defibrillation, Haynes had no chance of survival.
Dr. Charles A. Prejean is an emergency room doctor at Earl K. Long Hospital in Baton Rouge. Dr. Prejean testified that the medical records he reviewed showed that Haynes was in ventricular fibrillation. He also opined that defibrillation would have saved Haynes life.

Was Haynes already dead before the defibrillation attempts?
The defendants further contend that the evidence shows that Haynes was already dead when he collapsed. Therefore, they argue that the failure of the defibrillator did not cause Mr. Haynes to lose any chance of survival. However, the testimony of record does not support this conclusion.
The Louisiana Supreme Court in Hastings v. Baton Rouge General Hosp., 498 So.2d 713, 720-721 (La.1986) (footnotes omitted) explained the causation as it relates to loss of a chance of survival.
[T]here can be more than one cause in fact making both wrongdoers liable. See Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Anthony v. Hospital Service Dist. No. 1, 477 So.2d 1180 (La.App. 1 Cir.1985), writ den. 480 So.2d 743; and Thomas v. Corso, [265 Md. 84, 288 A.2d 379 (1972)] supra.
Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact for the jury. Anthony, supra; Hernandez v. Clinica Pasteur, Inc., 293 So.2d 747 (Fla.App.1974). A substantial factor need not be the only causative factor; it need only increase the risk of harm. Jones v. Montefiore Hospital, 494 Pa. 410, 431 A.2d 920 (1981). Jones relied on Restatement (Second) of Torts, § 326 (1965).
....
It is not necessary to prove that a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival. Destruction of a two percent chance of survival has been held to present a jury question as to causation. Kallenberg v. Beth Israel Hospital, 45 A.D.2d 177, 357 N.Y.S.2d 508 (1974), aff'd 37 N.Y.2d 719, 374 N.Y.S.2d 615, 337 N.E.2d 128 (1975). See Carr v. St. Paul Fire & Marine Insurance Company, 384 F.Supp. 821 (1974); Whitfield v. Whittaker Memorial Hospital, 210 Va. 176, 169 S.E.2d 563 (1969); and Hicks v. United States, 368 F.2d 626 (4 Cir.1966).
....
Defendant's conduct must increase the risk of a patient's harm to the extent of being a substantial factor in causing the result but need not be the only cause. Roberson v. Counselman, 235 Kan. 1006, 686 P.2d 149 (1984). Failure to afford a patient treatment which would have given him a forty percent chance of survival can be a substantial factor/cause for his death. Roberson, supra.
Reasoning that doctors and hospitals should not be released from negligence liability because a patient had less than a fifty percent chance of survival, Herskovits v. Group Health Co-op. [99 Wash.2d 609, 664 P.2d 474 (1983)] followed the rationale *1029 of Hamil v. Bashline [481 Pa. 256, 392 A.2d 1280 (1978)] to hold that a negligent act or omission, which increases the risk of harm, presents a jury question: was the increased risk a substantial factor in producing the fatal result? Although patient Herskovits had less than a fifty percent chance of survival at the time of the malpractice and that chance was only reduced by fourteen percent, the court concluded that the issue of causation should have gone to the jury.
"Thus, in a death case, if a defendant physician, by action or inaction, has destroyed any substantial possibility of the patient's survival, such conduct becomes a proximate cause of the patient's death. The law does not require the plaintiff to prove to a certainty that the patient would have lived had he received more prompt diagnosis and treatment for the condition causing the death." Brown v. Koulizakis, 229 Va. 524, 331 S.E.2d 440 at 446 (1985).
While opinions differ as to how great a chance of survival Mr. Haynes had, all the expert medical testimony, by witnesses for the defendants and for the plaintiffs, indicates that had Mr. Haynes been defibrillated timely, he would have had some chance of survival after the collapse. Consequently, we find no error with the jury's conclusion that Haynes lost a chance of survival.

PERCENTAGE CHANCE OF SURVIVAL LOST
The defendants raise several issues which concern the basis for the jury's conclusion that Haynes lost a more than fifty percent chance of survival as a result not being appropriately treated.

Did the court properly exclude the Medical Journal tendered by defendants?
The defendants argue that the trial judge erred in excluding from evidence an article from a medical journal.[1] Defendants allege that the article if admitted would have tended to show that chances of survival in heart attack victims are exaggerated. The article, "Cardiopulmonary Resuscitation on TelevisionMiracles and Misinformation," was purported by the defendants to be a study of the way in which television series depicting positive outcomes from emergency medical care for heart attack victims have given the viewing public an unrealistically positive view of the chances for survival of a heart attack.
Initially, it should be noted that a trial judge has vast discretion concerning the admission of evidence. The trial judge's decision to admit or exclude evidence will not be reversed on appeal absent a clear showing that he or she abused that discretion. Lemoine v. Hessmer Nursing Home, 94-836 (La.App. 3 Cir. 3/1/95); 651 So.2d 444.
State v. Simien, 95-1407, pp. 3-4 (La.App. 3 Cir. 7/24/96); 677 So.2d 1138, 1140-1141.
The jury had before it direct testimony by medical experts concerning Haynes' chance of survival. Accordingly, we cannot say that the trial judge abused his discretion in refusing to admit an article which did not directly concern the issues before the court.

Jury Instructions
The defendants argue that the trial judge erroneously instructed the jury that they should consider the chance of survival at the scene rather than the chance of survival to discharge from the hospital. This error they contend tainted the outcome of the case in that it caused the jury to find that the decedent lost a greater than fifty percent chance of survival.
This court in Todd v. Sauls, 94-10, pp. 3-4 (La.App. 3 Cir. 12/21/94); 647 So.2d 1366, 1371, writs denied, 95-0206, 95-0219 (La.3/24/95); 651 So.2d 289, discussed jury instructions as follows:
Adequate jury instructions fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. The instructions must properly reflect the law applicable in *1030 light of the facts of the particular case. Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5 Cir.), writ denied, 434 So.2d 1097 (La. 1983). The mere discovery of an error in the trial court's instructions does not automatically justify a de novo review by the appellate court without first measuring the gravity or degree of the error and considering the instructions as a whole and the circumstances of the case. The manifest error standard may not be ignored unless the jury charges are so incorrect or so inadequate that the jury was precluded from reaching a verdict based on the law and the facts. Barnett v. New Orleans Public Service Inc., 489 So.2d 452 (La.App. 4 Cir.1986).
When a jury is erroneously instructed and the error probably contributed to the verdict, the verdict must be set aside on appeal. Smith v. Travelers Insurance Company, 430 So.2d 55 (La.1983). Only then should the appellate court make an independent determination of the facts from the record, if possible, without according any weight whatsoever to the factual findings of the erroneously instructed jury. The manifest error rule is not to be used when the jury's factual findings favorable to the prevailing party have been tainted. Picou v. Ferrara, 483 So.2d 915 (La.1986).
Our review convinces us that it was error to instruct the jury to determine Haynes' chance of survival at the scene. The jury should have been instructed to determine Haynes chance of survival to discharge from the hospital.
Further, this error has a direct affect on the determination of the degree of loss and therefore on the outcome of the case. The Louisiana Supreme Court in Graham v. Willis-Knighton Medical Center, 97-0188, p. 17 (La.9/9/97); 699 So.2d 365, has explained the significance of this finding: "When the chance of survival ... is less than fifty percent, the court may not award full damages for the loss of life.... Smith v. State, Dept. of Health and Hosp., 95-0038 (La.6/25/96); 676 So.2d 543 (1996)." As a result, we must make a de novo determination with regard to the chance of survival lost.

Medical Testimony
The defendant's contend that Drs. Prejean and Luikart testified only with regard to Haynes' chance of surviving at the scene rather than to his chance of surviving to discharge from the hospital. Our review of this testimony reveals no support for this argument.
The expert medical testimony with regard to the percentage chance of survival is in conflict. Dr. Prejean opined that Haynes would have had a nine out of ten chance of survival if he had been defibrillated at the time of his collapse. He testified that the chances of surviving go down the more time passes before defibrillation. He stated that the sooner a patient suffering from ventricular fibrillation is defibrillated, the greater the chance of survival. He stated that had Haynes been defibrillated he would have had a better than fifty percent chance of surviving to be discharged from the hospital.
Dr. Carl Luikart, was the only cardiologist to testify. He opined that, had Haynes been properly defibrillated, he would have had a better than even chance of surviving to discharge. Without defibrillation, Dr. Luikart stated, Haynes had no chance of survival. He testified that nine out of ten people admitted through the emergency room with a heart attack survive to leave the hospital. He stated that the medical literature follows his own experience that when a patient suffering from ventricular fibrillation is defibrillated in under four minutes, they come back with little if any neurologic damage.
On the other hand, Dr. Homer Williams, the doctor on duty when Haynes was brought into the emergency room, testified that he felt that if a person is rapidly defibrillated and CPR is started immediately, it is reasonable to expect a thirty percent survival rate.
Dr. Mandry, an emergency room physician who serves as medical director for Acadian Ambulance, testified that with the best patient the survival rate would be approximately thirty-three percent. However, he felt that Haynes' general physical health put him in the lower half of survival rates.
*1031 Dr. Stephen Hedlesky, an emergency room physician who is the medical director for LifeCare, testified that paramedic witnessed heart attacks have a survival rate of approximately thirteen percent. He stated that, in light of Haynes' health problems and lifestyle, he thought Haynes' chance of survival, given immediate defibrillation, would have been closer to five to ten percent. Neither Dr. Luikart nor Dr. Prejean felt that the state of Haynes' general health would reduce his chance of survival below fifty percent.
"[W]hen the subject at issue concerns the particular field of a specialist's expertise, the testimony of the specialist is entitled to greater weight than that provided by other medical experts. Johnson v. La. Dep't of Health & Human Resources, 590 So.2d 854 (La.App. 3 Cir.1991)" Stelly v. Guy Scroggins, Inc., 96-401, p. 7 (La.App. 3 Cir. 10/9/96); 682 So.2d 782, 786, writ denied, 96-3060 (La.2/7/97); 688 So.2d 503. While emergency room physicians deal with the immediate consequences of heart attack, we believe that a cardiologist is more able to speak to a particular heart patient's chance of surviving to be discharged from the hospital. In this case, since Dr. Luikart was the only cardiologist to testify, we will give greater weight to his testimony than to that of the emergency room physicians with regard to Haynes' chance of survival to discharge. As a result, we conclude that Haynes had a greater than fifty percent chance of survival.

ADMISSION OF NETHKIN TESTIMONY
The defendants also challenge the trial judge's decision to allow certain testimony by plaintiffs' expert electrical engineer, Robert T. Nethkin. Defendants argue that in giving his opinion with regard to the cause of the malfunction of the defibrillator, Nethkin testified based on facts not in evidence. Based on his review of deposition testimony and of the user's manual provided by Physio-Control with the defibrillator, Nethkin concluded that battery failure was the cause of the malfunction. Nethkin noted that he based his conclusion in part on a deposition he had read which indicated that the defibrillator worked after the battery was changed by Baesler. Counsel for defendant objected to this testimony as being based on facts not before the jury and not part of the record. The judge overruled the objection.
It is a recognized principle of the law of evidence that if expert testimony given in response to hypothetical questions is predicated on a statement of unproven facts, it has no probative value and should not affect the outcome of the case. Brown v. Aetna Casualty & Surety Co., 96 So.2d 357, 360 (La.App. 2d Cir.1957). Although it is the judge's province to rule improper a hypothetical question predicated on facts totally lacking support in the record, an error in this regard is not reversible as long as other evidence fairly proves the matter addressed by the improper hypothetical. Guerra v. W.J. Young Construction Co., Inc., 165 So.2d 882, 887 (La.App. 4th Cir.1964). The jury, whose responsibility it is to determine the facts from the evidence, should decide whether or not the evidence proves the facts upon which the hypothetical was predicated. Ultimately, the weight to be given expert testimony is dependent upon the facts on which it is based as well as the professional qualifications and experience of the expert. If the opinion is based upon facts not supported by the record, the opinion may be rejected. Thomas v. Petrolane Gas Service Ltd. Partnership, 588 So.2d 711, 719 (La.App. 2d Cir.1991).
Meany v. Meany, 94-0251, pp. 10-11 (La.7/5/94), 639 So.2d 229, 236.
While it appears that the testimony was not properly admitted, we believe this error to have been rendered harmless by the later testimony of Baesler. Baesler's testimony confirmed that he had, in fact changed the battery in the defibrillator. While he indicated that the defibrillator did not work on the first try after this, it began to work with the new battery after Ledet hit it on the floor. This testimony does indicate that the unit began to work after a new battery was inserted. Further, the totality of the circumstances under which the unit began to work were made clear to the jury and the defendants had adequate opportunity to cross-examine Mr. Nethkin on this point. Therefore, *1032 we find that any error in allowing this testimony was harmless.

CAUSE OF MALFUNCTION
The defendants contend that the evidence supports the conclusion that the malfunction, and therefore the damage to Haynes, was caused by a defect in the defibrillator rather than by any negligence on their part. A large part of the trial testimony was devoted to the cause of the malfunction.
Bryan Ledet, the ambulance attendant, testified that when he first tried to defibrillate Haynes, he saw a green blinking light on the unit but was not aware that this was a low battery indicator. He stated that the light on the unit was a steady but dim green on later attempts to defibrillate Haynes. He testified that, after further unsuccessful attempts to use the defibrillator, he tried both his monitor battery and the extra battery in the unit without effect. He stated that after he took Haynes to the hospital, he and attendant from another ambulance, Jason Baesler, continued to try to get the defibrillator to work. They switched the battery in the defibrillator with one in Baesler's unit. Ledet testified that they again tried the defibrillator without success. He hit the unit on the floor and, when he tried the unit again, it worked. Baesler confirmed this testimony.
Dr. Virgil Boaz, an electrical engineer who testified on behalf of the defendants, felt that the fact the unit worked after being bumped on the floor indicated that the problem was an intermittency, rather than a dead battery. According to the trial testimony, intermittency, a failure of electrical contact, may be caused either by a defect in construction or composition of the unit. Over time an electrical contact may deteriorate and debris may lodge in the contact, preventing a complete electrical circuit and causing the unit not to function. However, Dr. Boaz, testified that such a defect cannot be pinpointed.
The condition of the batteries was the subject of a great deal of testimony. Robert T. Nethkin, an electrical engineer, explained the need for maintenance of the nickel cadmium batteries used in the portable defibrillator: Nicad batteries need to be completely discharged and recharged, or deep cycled, at least every three months. Otherwise they will develop a "memory" and will not hold a full charge. If this happens it is impossible to tell how much charge a particular battery will hold. Nethkin testified that it is important to keep records detailing the date on which each battery was deep cycled, so that it is clear that each battery is properly maintained and will hold a full charge.
The importance of this practice in the emergency health services was confirmed by Chris Oentjens, a licensed and certified paramedic. Oentjens indicated that a dead defibrillator can mean a dead patient. He stated that a failure to maintain batteries is a gross deviation from the customary and normal standard of care.
Bryan Ledet testified that all batteries used by LifeCare are sent to the main office for deep cycling every three months. However, it was not the practice of LifeCare to mark the batteries with the date of deep cycling, in spite of the fact that the batteries each had a label for this purpose. No logs were kept at the station to keep track of the batteries or when they were deep cycled. Jason Baesler testified that LifeCare had no policy with regard to testing defibrillators for working condition. Thomas Javins, the training officer for LifeCare, testified that LifeCare does not keep checklists for battery maintenance or logs to verify when deep cycling is done. John Holston, Jr. confirmed that no logs were kept of preventive or routine maintenance on the batteries. Holston further testified that the malfunctioning defibrillator was brought to LifeCare's main office where they have a defibrillator tester and a battery charger. When the defibrillator was tested everything worked as it should.

DIRECTED VERDICT
Defendants further contend that the trial judge erred in granting a directed verdict excluding the jury from considering evidence of the manufacturer's negligence and from considering comparative fault on the part of the deceased and/or the plaintiffs.
This court in Hebert v. Podiatry Insurance Co. of America, 96-567, p. 12 (La.App. 3 Cir. 10/9/96); 688 So.2d 1107, 1114, writ denied, 96-2726, 96-2728 (La.1/6/97); 685 So.2d 117, *1033 cited the first circuit decision in Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, p. 14 (La.App. 1 Cir. 3/11/94); 634 So.2d 466, 478, writ denied, 94-906 (La.6/17/94); 638 So.2d 1094, concerning the rules applicable to a motion for directed verdict:
A motion for a directed verdict is appropriately granted when, after considering all of the evidence in the light and with all reasonable inferences most favorable to the movant's opponent, it is clear that the facte and inferences point so overwhelmingly in favor of granting the verdict, that reasonable jurors could not arrive at a contrary verdict. Adams v. Travelers Insurance Company, 589 So.2d 605, 608 (La. App. 2nd Cir.1991); Armstrong v. Lorino, 580 So.2d 528, 533 (La.App. 4th Cir.), writ denied, 584 So.2d 1166 (La.1991); Barnes v. Thames, 578 So.2d 1155, 1162 (La.App. 1st Cir.), writs denied, 577 So.2d 1009 (La. 1991). However, if there is substantial evidence opposed to the motion, that is, evidence of such a quality and weight that reasonable and fair-minded men exercising impartial judgment might reach different conclusions, the motion should be denied, and the case should be submitted to the jury. Adams v. Travelers Insurance Company, 589 So.2d at 608; Cliburn v. Colonial Penn Insurance Company, 583 So.2d 103, 105 (La.App. 3rd Cir.1991); Armstrong v. Lorino, 580 So.2d at 533.
A trial judge has much discretion in determining whether or not to grant a motion for directed verdict. Barnes v. Thames, 578 So.2d at 1162. The standard of review for the appellate court is whether, viewing the evidence submitted, reasonable people could not reach a contrary verdict. Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d 827, 849 (La.App. 1st Cir.), writs denied, 605 So.2d 1117, 1119 (La.1992); Cliburn v. Colonial Penn Insurance Company, 583 So.2d at 105. Moreover, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the claims. Adams v. Travelers Insurance Company, 589 So.2d at 608.

Third Party Fault
LifeCare first asserts that a directed verdict should not be granted because the evidence supports the conclusion that the malfunction was the result of a design or construction defect. However, considering the evidence in the light most favorable to LifeCare and with all reasonable inferences in favor of LifeCare, we find little or no evidence which supports the conclusion that the malfunction was caused by intermittency in the defibrillator, rather than by a low or dead battery. Further, the record indicates that the alleged intermittency was not duplicated and that in later testing by Physio-Control the unit functioned properly. Accordingly, we cannot say that the trial judge abused his discretion in granting a directed verdict in this regard.

Comparative Negligence
The defendants further argue that the trial judge erred in granting a motion for directed verdict finding that the decedent and/or the plaintiffs were not comparatively negligent. The defendants argue that the record supports the conclusion that the plaintiffs negligence contributed to the decedent's loss of a chance of survival by failing to call an ambulance for more than an hour after Haynes began to have chest pains. However, there was no direct testimony that this was negligent conduct. While Dr. Prejean stated that "time is muscle" in the treatment of heart attacks, he also testified that most people wait much longer to call for help for a suspected heart attack. Accordingly, we cannot say that the trial judge abused his discretion in granting the motion for directed verdict on this point.

FAULT OF THE ATTENDANTS
The plaintiffs, in their answer to the appeal, contend that the jury erred in failing to find that the ambulance attendants, Ledet and Soileau, were grossly negligent.
The liability of the ambulance attendants is governed by La.R.S. 40:1235 A(1), which provides:
Any basic, intermediate, or paramedic medical technicians certified pursuant to the terms of this Part who render emergency *1034 medical care to a person while in the performance of his medical duties and following the instructions of a physician shall not be individually liable to such a person for civil damages as a result of acts or omissions in rendering the emergency medical care, except for acts or omissions intentionally designed to harm, or for grossly negligent acts or omissions which result in harm to such person....
The immunity granted herein to basic, intermediate, and paramedic emergency medical technicians by the provisions of this Part shall extend to parish governing authorities, police departments, sheriffs' offices, fire departments, or other public agencies engaged in rendering emergency medical services and its insurers with respect to such emergency medical services unless the emergency medical technician employed by said agencies would be personally liable under the provisions of Paragraph 1.
In order to prevail, plaintiffs needed to prove that the attendants' acts or omissions were either intended to inflict harm or were grossly negligent.
It is not enough for plaintiffs to prove simply that the EMTs acted negligently. Plaintiffs here must prove that defendants' actions or omissions were grossly negligent or intentionally designed to harm. The law, as required by the above quoted statute, thus accords emergency medical personnel a limited immunity from civil damages.
Louisiana courts have frequently addressed the concept of gross negligence. Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." State v. Vinzant, 200 La. 301, 7 So.2d 917 (La.1942). Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Hendry Corp. v. Aircraft Rescue Vessels, 113 F.Supp. 198 (E.D.La.1953) (applying Louisiana law). Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of even scant care." W. Page Keeton, et al., Prosser & Keeton on the Law of Torts, Sec. 34, at 211 (5th ed.1984); 65 C.J.S. Negligence, Sec. 8(4)(a), at 539-40 (1966 & Supp.1993). "There is often no clear distinction between such [willful, wanton, or reckless] conduct and `gross' negligence, and the two have tended to merge and take on the same meaning." Falkowski v. Maurus, 637 So.2d 522 (La.App. 1st Cir.), writ denied, 629 So.2d 1176 (La.1993) (quoting Prosser & Keeton, supra, at 214). Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence.
Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099, pp. 5-6 (La.7/5/94); 639 So.2d 216, 219-220.
The evidence with regard to the negligence of the ambulance attendants is in conflict. Chris Oentgens testified that it took the crew too long to get to the scene, that they should have brought equipment for dealing with a heart emergency into the house with them on entry and that they stayed too long on the scene after ascertaining that the defibrillator did not work. However, Thomas Javins, the training officer for LifeCare, testified that the decision as to what equipment to bring into the residence when on a call depends largely on the nature of the call and the preference of the medic some prefer to treat in the field and others prefer a quick transport. Dr. Hedlesksy, the medical director for LifeCare, opined that the attendants did not remain too long on the scene. Dr. Mandry confirmed this, stating that the general procedure is to load and go with trauma and to treat at the scene with medical emergencies. He further stated that necessary procedures such as intubation or starting an IV are difficult to accomplish in an ambulance. He also testified that it is appropriate to leave the equipment in the ambulance until finding out what is needed.
In light of this evidence, we cannot say that the jury erred manifestly in failing to find the defendants grossly negligent. There is sufficient evidence of record to allow the jury to conclude either that the loss of chance of survival resulted entirely from the *1035 negligence of LifeCare, rather than from the negligence of its employees, or that the attendants' actions, while negligent, were not grossly negligent or intended to do harm.

LEJEUNE DAMAGES
The plaintiffs claim that the awards were inadequate and that the trial judge erred in refusing to allow the jury to consider Lejeune[2] damages under La.Civ.Code art. 2315.6. However, the jury did award the kind of damages provided for in Lejeune. The jury made awards to each of the plaintiffs for loss of consortium and for mental anguish, grief and emotional distress. Awards of damages in connection with wrongful death claims do not normally include awards for emotional distress.
The elements of damage for wrongful death are loss of love, affection and companionship, loss of support, and funeral expenses. The measure of damages for loss of love, affection and companionship is analogous to that for pain and suffering; that is, there must be an awareness of the loss by the deceased before he dies and a consideration by the trier of fact of the duration of the anguish. Wakefield v. Government Employees Insurance Co., 253 So.2d 667 (La.App. 4th Cir.1971), writ denied, 260 La. 286, 255 So.2d 771 (1972); Walker v. St. Paul Ins. Companies, 339 So.2d 441 (La.App. 1st Cir.1976), writ granted for other reasons, 341 So.2d 554 (La.1977), on remand 343 So.2d 251 (La. App. 1st Cir.1977).
Baudoin v. Acadia Parish Police Jury, 620 So.2d 453, 459 (La.App. 3 Cir.1993), writ denied, 626 So.2d 1166 (La.1993). The court in Lejeune approved awards of damages for emotional distress in certain circumstances.
Damages for mental pain and anguish arising out of an injury to another may be awarded when: (1) the claimant has viewed an accident or injury or arrived upon the scene soon thereafter before the victim's condition has substantially changed; (2) the victim suffered a traumatic injury of such severity that one in the claimant's position would be expected to suffer serious mental anguish; (3) the emotional distress is serious and reasonably foreseeable; and (4) there is a close relationship between the victim and the claimant. Blair v. Tynes, 621 So.2d 591 (La.1993); Lejeune v. Rayne Branch Hosp., 556 So.2d 559 (La.1990).
Delphen v. Department of Transp. and Development, 94-1261, p. 17 (La.App. 4 Cir. 5/24/95); 657 So.2d 328, 337, writs denied, 95-2116, 95-2124 (La.11/17/95); 663 So.2d 716, 717. Since the jury awarded damages of the kind provided for in Lejeune, we find that any error on the part of the trial judge in this regard was harmless.[3]

QUANTUM
Both plaintiffs and defendants dispute the damage awards, the plaintiffs as inadequate and the defendants as excessive. The supreme court in Youn v. Maritime Overseas Corp., 623 So.2d 1257,1260-61 (La. 1993) (footnote omitted), explained the appropriate standard of review applicable to general damage awards:
In Reck v. Stevens, 373 So.2d 498 (La. 1979), this Court commented on appellate review of general damage awards and on the "much discretion" in fixing damages accorded to trial courts by La.Civ.Code art.1934(3) (1870). The decision pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
In Reck, this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on *1036 the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974).
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Given the circumstances of this case, the relative ages of the children of the decedent, the long term effects on the lives of each of the plaintiffs, we find that the awards made were within the range which a reasonable trier of fact could assess for the particular injuries received. Therefore we will not disturb the awards.
CONCLUSION
The judgment of the trial court is affirmed. Costs of this appeal are to be paid by the defendants/appellants.
AFFIRMED.
THIBODEAUX, J., concurs.
NOTES
[1] We note that the defendant's argument on this point is not in conformity with Uniform Rules Courts of Appeal 2-12.4, which states that: "The argument on a specification or assignment of error in a brief shall include a suitable reference by volume and page to the place in the record which contains the basis for the alleged error. The court may disregard the argument on that error in the event suitable reference to the record is not made."
[2] Lejeune v. Rayne Branch Hosp., 556 So.2d 559 (La.1990).
[3] Deena should not have received an award of Lejeune damages, since she was not actually present when her father collapsed. However, the defendants have not raised this as error. Therefore, we will not change this award.