664 So.2d 643 (1995)
Thomas E. DOWDEN, Plaintiff-Appellant/Appellee
v.
MID STATE SAND & GRAVEL CO. INC., et al., Defendants-Appellees/Appellant.
No. 95-231.
Court of Appeal of Louisiana, Third Circuit.
November 2, 1995.
Writ Denied February 2, 1996.
*646 Robert Thomas Jacques Jr. and Stephen Ronald Streete, Lake Charses, for Thomas E. Dowden.
Howard Battle Gist III, Alexandria, for Mid State Sand & Gravel Co. Inc. et al.
Brian D. Cespiva, Alexandria, for State of Louisiana, Thru DOTD.
Before DOUCET, C.J., YELVERTON, and PETERS, Judges.
PETERS, Judge.
The plaintiff, Thomas E. Dowden, brought this action to recover for personal injuries and property damages he sustained as a result of an automobile accident which occurred in Rapides Parish, Louisiana, on July 11, 1990. Dowden named as defendants Mid State Sand & Gravel Company, Inc.; Audubon Indemnity Company (Mid State's liability insurer); and Diamond "B" Construction Company, Inc.; (collectively referred to hereinafter as Mid State); and the State of Louisiana through the Department of Transportation and Development (DOTD). DOTD filed a cross-claim against the other defendants seeking indemnification for any damages which it might be obligated to pay to Dowden.
A bifurcated trial was held in which the jury found Mid State five percent at fault, DOTD five percent at fault, and Dowden ninety percent at fault. The jury then awarded Dowden $200,000.00 in general damages, $50,000.00 in loss of earnings, and $2,569.03 in medical expenses, subject to a reduction for his share of fault. The trial judge found that DOTD was sixty percent at fault in causing the accident. After a motion for judgment notwithstanding the verdict (JNOV) was filed pursuant to La.Code Civ.P. art. 1811, the trial judge reconciled the jury verdict and her judgment by reducing Dowden's fault to thirty-five percent. Thus, the reconciled judgment apportioned fault as follows: five percent to Mid State, sixty percent to DOTD, and thirty-five percent to Dowden. The trial judge did not change the jury's award of damages.
Both Dowden and DOTD appeal the assessment of fault and the amount of damages awarded. Additionally, DOTD contends that the trial judge erred in failing to award it indemnification. Mid State has answered the appeal contesting the assessment of fault and the amount of damages.

DISCUSSION OF RECORD
The accident occurred on Louisiana Highway 113 on the morning of July 11, 1990. The plaintiff had left his home in Pitkin, Louisiana, at about 6:15 A.M. and was traveling east on Louisiana Highway 113 on his way to work. For a number of days prior to the accident, Mid State had been conducting maintenance and repair work on Louisiana Highway 113 pursuant to a contract with DOTD. The plaintiff was aware of the construction work, having traveled the highway almost daily. However, the road construction activity was continuously moving, and the day before the accident, it was located *647 approximately one and one-half miles from the accident scene.
A "Road Construction Ahead" sign, a "One Lane Road Ahead" sign, and a "Flagman Ahead" sign were in place west of Ten Mile Bridge. Additionally, two permanent "Under Construction" signs warning eastbound traffic of the upcoming construction area were located approximately 500 feet west of Ten Mile Bridge. The construction area was also marked with permanent highway signs designating the speed limit to be forty-five miles per hour. A flagman was located approximately 200 to 300 feet west of the beginning of the construction area, but no cones or other channeling devices were set out to direct traffic around that portion of the eastbound lane under construction.
The plaintiff claims he saw neither the warning signs nor the flagman. As he crossed Ten Mile Bridge, he was blinded by the rising sun. Approximately 2200 feet east of the bridge, he drove his vehicle into the rear of a stationary steamroller which was owned and operated by Mid State. The steamroller was stationary in the eastbound lane of traffic because the Mid State work crew was in the process of unclogging the steamroller tips.
Shortly after the plaintiff hit the steamroller and before he could be removed from his vehicle, another vehicle ran into the steamroller. State Trooper Ronald E. Briley, who investigated the accident, found no skid marks from either vehicle at the scene of the accident.

STANDARD OF REVIEW
Courts of appeal normally review findings of fact under the manifest error or clearly wrong standard. Rosell v. ESCO, 549 So.2d 840 (La.1989). The trial judge granted a JNOV. We have previously held that, in a bifurcated trial where the jury and the trial judge reach conflicting findings as to the liability of the public and private defendants, a JNOV is a proper means of reconciling the verdicts. Ourso v. Grimm, 92-1274 (La.App. 3 Cir. 1/5/94); 630 So.2d 963. The granting of a JNOV is reviewed under the manifest error standard. Higley v. Kramer, 581 So.2d 273 (La.App. 1 Cir.), writ denied, 583 So.2d 483 (La.1991). Thus, we review the JNOV under the manifest error standard. Rosell, 549 So.2d 840.

LIABILITY
All of the parties contest the determination of fault. We may use a duty-risk analysis in resolving the negligence questions before us. Theriot v. Lasseigne, 93-2661 (La. 7/5/94); 640 So.2d 1305.

Negligence of Mid State
The contract between the DOTD and Mid State provided for the use of the previously described warning signs as well as other warning devices. According to the contract, Mid State was required to place cones or channeling devices a minimum of 150 feet west of the construction site, but this distance was to be extended as required. A flagman was to be located at a position west of the construction site such that he would be clearly visible to the motoring public for at least 250 feet. A sign warning of the flagman ahead was to be located 500 feet west of the flagman's location. Next, a twenty mile per hour speed limit sign was to be located 250 feet west of the flagman warning sign, and a sign warning of the closed lane ahead was to be located a minimum of 500 feet and a maximum of 1500 feet west of the flagman warning sign. Another sign designating the speed limit to be forty-five miles per hour was to be placed 250 feet west of the sign warning of the closed lane situation, and 250 feet west of that sign, another sign warning of the impending road construction was to be located. The traffic traveling from east to west was to encounter a similar arrangement except that the westbound lane was not closed. Dowden contends that Mid State is at fault because it failed to comply with the provisions of its contract relative to warning devices and because it left the steamroller stationary in the eastbound lane.
It is not disputed that the twenty mile per hour sign and channeling devices required under the contract were not in place in the eastbound lane at the time of the accident. Samuel Boothe Cooper, the project engineer for DOTD, had given Mid State permission *648 to dispense with their use. The defendants argue that the contract provisions concerning signing were not intended to be minimum requirements but were subject to engineering judgment. They reasoned that the other signs together with the flagman were adequate to warn the motoring public. We first note that the presence or absence of the twenty mile per hour sign is not dispositive of the litigation. The plaintiff acknowledges that he did not see the other signs or the flagman, and there is no reason to believe he would have seen the twenty mile per hour sign if it had been posted. Thus, the fault analysis concerns the effect of the failure to use the channeling devices.
The trial judge found that the contractual signing requirements were clearly intended to be minimum standards for signing a moving operation on the public highway and that Mid State breached that standard by failing to use the channeling devices. We agree. Although Joseph David Blaschke, a civil engineer and expert in traffic safety and traffic engineering, was of the opinion that the contract provisions were not intended to be minimum standards and were subject to engineering judgment, we find nothing in the contract itself to suggest that its terms were anything less than minimum standards. By its very terms, the contract provides that 150 feet is not a minimum distance in itself. In fact, the contract specifically provides for an extension of the 150 foot channeling distance when required by the existing situation.
We note, however, that the failure to meet the requirements of a construction contract is not negligence per se. See McManus v. Barber Bros. Contracting Co., Inc., 552 So.2d 1017 (La.App. 1 Cir.1989), writ denied, 558 So.2d 1118 (La.1990). Rather, the deficiency must be a cause-in-fact of the accident, and the duty owed must have encompassed the particular risk of harm involved. Id. By finding fault on the part of Mid State, it is clear that the trial judge and the jury found that the failure to use channeling devices in accordance with the contract terms was a cause-in-fact of the accident and plaintiff's injuries and that Mid State breached a duty owed to Dowden.
The expert testimony is in dispute on this point. George Thomas Walton, a civil engineer and expert in traffic safety and traffic engineering, was of the opinion that the accident was caused in part by the failure to use the channeling devices. Walton did not consider the flagman a sufficient warning to eastbound motorists of the presence of the steamroller in the eastbound lane. In his opinion, a cone or other channeling device would have provided the ultimate warning something for the driver to impact before he hit the immovable object, thereby giving him an opportunity to alter his travel before impact. However, he testified that even if the cones would have been in place, "there is every possibility that the ... driver may have still had an accident; however ... [he does] not believe that he would have ... struck the roller at 55 miles per hour." Blaschke was of the opinion that the safety measures in place on the date of the accident were adequate and that cones or other channeling devices were not necessary. In his opinion, because the construction operation was moving, it was not worth the effort to move the cones. He was of the opinion that the cones would not have prevented the accident from happening as it did.
We agree with the assessment that with or without the cones an accident would have occurred anyway. Given the speed the plaintiff was traveling immediately prior to the accident (forty-five to fifty-five miles per hour), it is probable that had the cones been in place a minimum of 150 feet from the construction area, the plaintiff would not have had adequate time to stop prior to impact with the steamroller. However, in evaluating a question of fault, the trier of fact must analyze "the fault of the parties in causing the harm" to the plaintiff as well as the accident itself. Campbell v. Louisiana Dep't of Transp. & Dev., 94-1052 (La.1/17//95), 648 So.2d 898, 902. Also, we note that a contractor owes a duty to the public beyond the literal fulfillment of the plans and specifications of its contract with DOTD. See Knotts v. State, Dep't of Highways, 395 So.2d 419 (La.App. 3 Cir.), writs denied, 400 So.2d 669, 670 (La.1981). We do not find that Mid State was entitled to rely on the contract when conditions required a *649 greater measure of protection. Anyone contracting with DOTD to do road repair work has a duty not to expose the traveling public to undue hazards. Id.; Rivet v. State, Dep't of Transp. & Dev., 434 So.2d 436 (La.App. 3 Cir.1983). A contractor doing construction work on a public highway has a duty to mark, barricade, or warn the public of conditions in the construction site which pose an unreasonable risk of harm. Jenkins v. State, Dep't of Transp. & Dev., 619 So.2d 1188 (La.App. 1 Cir.), writ granted and rev'd in part on other grounds, 625 So.2d 1050, and writ denied, 625 So.2d 1058 (La.1993).
Mid State was aware of the blinding condition of the sun at the location of the construction and was aware that the steamroller tips were subject to clogging. Additionally, Mid State could not rely on the public slowing down to anything less than forty-five miles per hour because the twenty mile per hour sign was not in place. In light of the reduced or nonexistent visibility, the speed limit at the location, and the possibility of having stationary equipment on the road for even a short time, Mid State should have known that additional warning devices were necessary, at least for that time of the day. We find no manifest error in the determination that Mid State breached a duty owed to Dowden and that the breach was a cause-in-fact of the accident and the resulting injuries.

Negligence of DOTD
DOTD has a duty to maintain safe highways and shoulders. Jones v. State, Dep't of Transp. & Dev., 478 So.2d 691 (La. App. 3 Cir.1985), writ denied, 480 So.2d 743 (La.1986). This duty is nondelegable. Deville v. Budd Constr. Co., 617 So.2d 570 (La.App. 3 Cir.), writ denied, 625 So.2d 180 (La.1993). We recognize that DOTD's standard of care in a highway area under construction is somewhat less than the standard required for a highway area not under construction. Poland v. Glenn, 623 So.2d 227 (La.App. 2 Cir.), writ denied, 629 So.2d 1171 (La.1993). Still, DOTD has the duty to exercise reasonable care to warn motorists of any dangerous conditions in a construction zone. Id. Reasonable care requires, and DOTD owes, a duty to erect barricades, signs, and adequate warnings to alert the motoring public to extremely dangerous, trap-like hazards; unusual obstructions; perilous conditions; and road defects. Id. Whether a warning is required, reasonable, or adequate depends on the place where the danger exists, the nature of the road, and the general situation and circumstances surrounding it. Id. Consideration must be given to all the facts, including the kind and speed of vehicles, in order to determine whether DOTD has discharged its duty. Id.
We find that in this case, the duty to assure Mid State's compliance with the minimum warning requirements of the contract was included within DOTD's general duty to maintain safe highways and within its duty to exercise reasonable care to warn motorists of any dangerous conditions in a construction zone. DOTD did not assure compliance by the contractor and actually authorized Mid State to ignore certain minimum provisions of the contract, specifically the use of channeling devices. Thus, DOTD breached a duty it owed to the motoring public in general and Dowden in particular. As we have already stated, the absence of the channeling devices was a cause-in-fact of this accident.
Additionally, even if we were to conclude that the contractual provisions were subject to engineering judgment, for the same reasons we find Mid State at fault, we find that good engineering judgment would not have allowed waiver of this requirement under the circumstances present. Because of the reduced or nonexistent visibility and the speed limit at the construction location, we find that an adequate warning included more than that which was in place at the time of the accident. Contact with the cones would have provided a sure alert in a situation in which the signs and the flagman were obscured. We find no merit in the assertion that it would have been too much trouble to move the channeling devices, particularly since the cones were easily movable, the potential for injury was great, and the project moved only approximately three miles per day. Thus, we find no manifest error in the conclusion that DOTD breached a duty owed to the plaintiff in failing to assure that adequate *650 warning devices were in fact present and this breach was a cause-in-fact of the accident.

Negligence of Plaintiff
We must address whether Dowden was comparatively at fault in causing this accident. In Avery v. Commercial Union Ins. Co., 621 So.2d 184, 191 (La.App. 3 Cir. 1993), this court explained:
It is well settled that when visibility is impaired by smoke, fog, or other unfavorable atmospheric conditions, a motorist must exercise care in the operation of his vehicle commensurate with the danger created by the conditions. He must reduce his speed and maintain a close lookout. As an extreme measure, when visibility is destroyed or greatly obscured, he must stop his vehicle until conditions permit him to resume travel in reasonable safety. A motorist does not have the right to assume that his course of travel is free from danger or obstruction in the absence of his ability to see clearly ahead. If he continues to travel as if he knew there was perfect clearance ahead, he does so at his own risk and peril.
(Citation omitted).
Dowden proceeded at a speed of forty-five or fifty-five miles per hour despite the lack of visibility. He testified that he did not stop because he was trying to get to work and he had put his sun visor down so that he could see. Furthermore, Dowden admitted he knew construction was ongoing. Under the circumstances of this case, we find no manifest error in the finding that Dowden was comparatively at fault.

Apportionment of Fault
The trial judge concluded that DOTD was sixty percent at fault in causing this accident. Both the trial judge and the jury agreed that Mid State was five percent at fault in causing the accident. The jury concluded that Dowden was ninety percent at fault in causing the accident, and this was adjusted to thirty-five percent by the trial judge in the JNOV.
Concerning apportionment of fault, various factors may influence the degree of fault assigned, including (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might have required the actor to proceed in haste, without proper thought. Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985).
In this case, DOTD was in a superior position to protect against the risk that occurred. The project engineer had supervision and control over the work site and made a decision to allow the contractor to proceed without using channeling devices as required by the contract. There was no evidence to suggest that this decision was made for any reason other than convenience to Mid State. Given the nature of the danger, the awareness thereof, and the significance of what was sought by this lack of compliance, it is not acceptable to suggest that compliance with the contract was not necessary because it was not worth the effort. While Mid State was not responsible for formulating the plan for signs at the location, it was in a position to know of the danger caused by the visibility conditions and the machinery being used on the project. Finally, Dowden should have been aware of the danger of proceeding into an area under construction at a speed of forty-five to fifty-five miles per hour when his visibility was obscured. We do not expect that he should have stopped his vehicle until he could see clearly, but we do find that he should have slowed down significantly.
In applying the manifest error standard, we are not to determine whether, in our opinion, the trier of fact was right or wrong but whether the conclusion was a reasonable one. Stobart v. State, Dep't of Transp. & Dev., 617 So.2d 880 (La.1993). Even though we may conclude that our determinations are more reasonable than those of the trier of fact, "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." Id. at 882. Accordingly, we do not find that the apportionment *651 of fault by the trial judge in granting the JNOV was manifestly erroneous, and we affirm that portion of the decision.

DAMAGES
The jury awarded $100,000.00 for past, present, and future pain and suffering; $50,000.00 for past, present, and future mental anguish and distress; and $50,000.00 for physical disability. It also awarded $50,000.00 for loss of earnings. The plaintiff contends the award is inadequate while the defendants contend it is excessive. While we recognize that evaluation of the underlying facts upon which a damage award is based is still the manifest error standard, the evaluation of the amount awarded is subject to the abuse of discretion standard. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).

General Damages
Immediately after the accident, Dowden was taken to Huey P. Long Regional Medical Center in Pineville, Louisiana, where he was diagnosed as having suffered abrasions, a laceration to the chin, a bruise over the left anterior chest wall, a deep laceration to the central part of his right knee, and a comminuted fracture of the right acetabulum or right hip-joint socket. Immediate treatment included suturing of the chin; irrigation, debridement, and closure of the open right knee laceration; and traction. Eight days after the accident, Dowden underwent an open reduction internal fixation of the right acetabulum, which included use of a plate and screws.
The day following this surgery, Dowden was noted as having peroneal nerve palsy which involved his right foot. The peroneal nerve is the main nerve that gives feeling to the skin around the foot and into the muscles that work the foot and ankle. Peroneal nerve palsy is also referred to as "foot drop." According to Dr. Christopher Rich, an Alexandria, Louisiana orthopedic surgeon who assisted in the acetabulum surgery, an individual suffering from this condition would have "kind of a slapping gait if [he is] not wearing a brace." As a result of the acetabulum surgery, the plaintiff was only able to ambulate with the assistance of crutches. Dowden also underwent five days of radiation treatment at the fracture point. He was discharged from the hospital on July 31, 1990, and continued to use crutches for a period of time after his discharge.
Trial was held approximately three and one-half years after the accident. At trial, Dowden testified that pieces of glass still work out of his head from time to time; he walks with a limp; he cannot climb stairs very well or lift anything heavy; his hip still causes pain, and because of it, he can only sit for short periods of time; he suffers from numbness from his knee to the end of his toes; and he continues to have a "foot drop." He testified that the peroneal nerve palsy requires him to wear a brace from his knee almost to the arch of his foot except when he is wearing high top or cowboy boots or is simply around the house. His activities have been limited because of his injuries. Prior to the accident he dug for arrowheads, played games at an annual family reunion, hunted, and fished. He claims these activities are restricted as a result of his injuries. Now he is fearful of lifting his daughter because he is afraid he will drop her. He also testified that he only drives when he absolutely has to because of the "foot drop."
Dr. Rich testified that a fractured acetabulum is a painful injury requiring a significant amount of narcotic and that the permanent metal plate and screws around the hip joint would be a source of pain from time to time in the future. Also, Dr. Rich was of the opinion that Dowden's chances of having arthritis in the future have increased. Concerning the peroneal nerve palsy, Dr. Rich testified that if Dowden still had the peroneal palsy by the time of trial, the chances of him recovering from it would be minimal.
Dr. William F. Foster, a Lake Charles, Louisiana neurosurgeon, saw Dowden on one occasion following the accident. Based on his examination, Dr. Foster was of the opinion that Dowden had possibly sustained an injury to a lumbar or cervical disc. He recommended additional testing including an MRI, EMG, and myelogram, but these tests were not performed. Without these *652 test results, Dr. Foster was not able to establish that a disc injury existed, nor did he establish causation between the possible disc injury and the accident. Therefore, pain and suffering for these injuries should not be included in the award.
DOTD and Mid State contend that the award for mental anguish and distress is unsupported by psychiatric evidence and should be reversed. They contend the only expert evidence of the plaintiff's mental condition was that of rehabilitation expert testimony which reflected that Dowden had an excellent mental attitude.
Additionally, Mid State cites Baudoin v. Acadia Parish Police Jury, 620 So.2d 453, 458 (La.App. 3 Cir.), writs denied, 626 So.2d 1166 (La.1993), for the proposition that "[m]ental trauma requires more substantial evidence than just the victim's self-serving testimony." We note that in Baudoin the plaintiff's claim was for lost wages resulting from his alleged inability to return to work caused by mental problems arising from an automobile accident. The plaintiff claimed this disability arose from his reaction to the death of his girlfriend and her son in the accident. This court concluded that, in that case, the plaintiff had failed to produce sufficient evidence to establish that he suffered mental trauma which prevented him from returning to worknot that in every case expert testimony is necessary to recover for mental anguish damages.
Rather, we note that in Lejeune v. Rayne Branch Hosp., 556 So.2d 559, 563 (La.1990), the supreme court stated:
[M]edical advances of today provide greater objective proof of [mental anguish] damages so that it is no longer necessary to rely solely on the plaintiff's testimony of damages to allow recovery. Kolder v. State Farm Ins. Co., 520 So.2d 960, 964, n. 2 (La.App. 3d Cir.1987); Versland v. Caron Transport, 206 Mont. 313, 671 P.2d 583 (1983).
We do not interpret this to mean that a plaintiff's testimony alone will not, in some cases, support an award of mental anguish damages. Additionally, in Kolder v. State Farm Ins. Co., 520 So.2d 960 (La.App. 3 Cir.1987), this court upheld a factual determination by the trial court that a plaintiff experienced mental trauma where the sole evidence of trauma was the plaintiff's testimony. However, in a footnote, the court noted that mental trauma should be and generally is proven by more substantial evidence than just the victim's potentially self-serving testimony. Finally, in Medical Review Panel Bilello v. Alton Ochsner Medical Found., 621 So.2d 6 (La.App. 4 Cir.), writ denied, 629 So.2d 1139 (La.1993), despite the lack of medical testimony concerning her mental state, a plaintiff was awarded damages for mental anguish arising out of her son's death, based on her testimony, on her mother's and stepfather's testimony, and on circumstances surrounding the case. Thus, we find no merit in the defendants' argument on this point.
In regard to the overall award of general damages, we note that in Youn, 623 So.2d at 1261, the Louisiana Supreme Court stated:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
In the instant case, even without finding a causal connection between the accident and the possible disc injury, we find no abuse of the vast discretion of the trier of fact in its award of general damages. Thus, we affirm this award.

Loss of Earnings
Charles O. Bettinger III, Dowden's expert in the fields of statistics and economics, estimated Dowden's past loss of earnings to be $46,456.00 and his future loss of earnings to be $328,000.00. Dan M. Cliffe, the defendants' expert in the fields of economic analysis and quantification of economic loss, estimated Dowden's past loss of earnings to be $3,995.00. Assuming future inability to *653 work, he estimated Dowden's future loss of earnings to be either $281,000.00 or $193,000.00, depending on the wage base used for the calculation. The differences of opinion between the experts are due primarily to a disagreement on the appropriate wage base as well as on the period of Dowden's disability. We observe that the trial court's award of $50,000.00 is closest to Bettinger's calculation of past loss of earnings.
Dowden was twenty-seven years old at the time of the accident. He had a high school education and a manual labor work history. At the time of the accident, he was employed at a nursery earning minimum wage, or $4.35 per hour. Bettinger used a base of $5.82 per hour, which he found to be Dowden's highest actual earnings at anytime prior to the accident. Cliffe used a minimum wage base. Additionally, the defendants contend that Dowden ceased to be totally disabled six months after the accident.
A claim for loss of earnings does not have to be proven with mathematical certainty but only by such proof as reasonably establishes the plaintiff's claim. Veazey v. State Farm Mut. Auto Ins., 587 So.2d 5 (La.App. 3 Cir.1991). Additionally,
[e]arning capacity itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
Id. at 7.
The trier of fact in the instant case could have concluded that Dowden had an earning capacity of $5.82 per hour since he had demonstrated he was able to earn that much prior to the accident even though he was not earning that much at the time of the accident. We find no error in this regard.
It appears from the judgment that the jury did not award an amount for future loss of earnings. In Aisole v. Dean, 574 So.2d 1248, 1252 (La.1991), the court stated:
To obtain an award for future loss of wages and/or loss of earning capacity, a plaintiff must present medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the accident.
Dr. Rich testified he could not predict what effect the acetabular fracture would have on Dowden's ability to perform heavy manual labor in the future as he did not follow Dowden as a patient. He noted that the extent of disability involving this type of injury varies with the individual. However, Dr. Rich also noted that with the acetabular fracture, the chances of Dowden having arthritis have increased, although he did not know when the arthritis might manifest itself. Additionally, he noted that with the fracture, he would expect to see pain associated with it from time to time.
Dr. Rich was of the opinion that if Dowden still had the peroneal nerve palsy by the time of trial, the chances of him recovering would be minimal. He also was of the opinion that if Dowden's peroneal nerve palsy caused him to function with a noticeable limp and required the wearing of a brace, he could not be involved in manual labor but that if he could function without the limp and brace, there would be many activities he could perform. Still, assuming the use of a brace and existence of a limp, Dr. Rich was of the opinion that Dowden's physical condition did not exclude him from all types of employment. Dr. Rich thought Dowden would need a function test to see what he could and could not do. We have not found a function test in the record. Dr. Foster also was of the opinion that because of the peroneal nerve palsy, Dowden should not be doing anything that would require any kind of lifting, bending, stooping, straining, climbing, or related activities.
The defendants presented no medical expert testimony but did present a medical record from Huey P. Long Regional Medical Center dated December 18, 1990, just over five months after the accident. That record states that Dowden may return to light duty work and also states: "Typical 1 year partial disability." Dr. Rich indicated that such a recovery period was possibly "about right" *654 after a surgical procedure for a fractured acetabulum.
We do not find that the jury was clearly wrong in failing to award future loss of earnings to Dowden for permanent total disability. While the evidence supports that Dowden has some residual disability, the jury could have found that Dowden did not prove the extent and duration of this disability for loss of earnings purposes. Thus, we affirm the award for loss of earnings.

INDEMNITY
DOTD contends that the trial judge erred in failing to address the issue of contractual indemnity and in failing to order indemnification from Mid State to DOTD. Initially, we note that as a general rule, where a judgment is silent regarding a demand which was an issue in the case under the pleadings, such silence constitutes an absolute rejection of the demand. Sun Fin. Co., Inc. v. Jackson, 525 So.2d 532 (La.1988).
The contract between Mid State and DOTD provides that the general highway specification manual, the LOUISIANA STANDARD SPECIFICATIONS FOR ROADS AND BRIDGES (1982), is applicable to the contract. Section 107.18 of that publication provides for indemnification for liability attributable to the conduct of the contractor. That section provides in relevant part:
The contractor shall indemnify the Department, its officers and employees from all suits, actions or claims brought because of injuries or damages sustained by any person or property on account of operations of the contractor; or on account of negligence in safeguarding the work; or through use of unacceptable materials in constructing the work; or because of any negligent act, omission or misconduct of the contractor....
In this case, DOTD is asking that the court award indemnification for its negligence, not that of Mid State. La.R.S. 38:2216(G)(1) provides in part that any hold-harmless or indemnity agreement provision contained in a public contract, other than a contract of insurance, from the contractor to the public body for damages arising out of injuries or property damage to third parties caused by the negligence of the public body is contrary to public policy of this state and is null and void. Thus, it is clear that DOTD may not receive indemnification from Mid State for DOTD's own negligence.
DOTD also argues that if this court finds solidary liability between DOTD and Mid State, we should enforce the indemnity provision of the contract. La.Civ.Code art. 2324(B) provides in pertinent part:
[L]iability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however,... a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed.
In this case, Mid State is not liable to the plaintiff for any amount greater than five percent because the plaintiff's degree of fault is greater than Mid State's. Additionally, because DOTD's fault has been set at sixty percent, it would not be responsible to Dowden for Mid State's five percent anyway since under La.Civ.Code art. 2324(B), solidary liability exists only to the extent necessary for Dowden to recover fifty percent of his recoverable damages. Without addressing whether the result would be different had DOTD's liability been less than fifty percent, we find that in this case DOTD may not recover indemnity from Mid State for Mid State's negligence.

DISPOSITION
For the foregoing reasons, the judgment is affirmed in all respects. We assess costs of this appeal to the parties in proportion to their liability.
AFFIRMED.