852 So.2d 1109 (2003)
Donald WOODS, Donna W. Bringol, Ritchie Woods and Russell G. Woods, Plaintiffs-Appellants,
v.
STATE of Louisiana Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT and Arnold Construction Company, Defendants-Appellees.
No. 37,185-CA.
Court of Appeal of Louisiana, Second Circuit.
August 14, 2003.
*1111 Paul Boyd Wilkins, Columbia, W. Mark McKee, West Monroe, for Appellants Donald R. Woods, Donna W. Bringol, Ritchie Woods and Russell G. Woods.
Hudson, Potts & Bernstein, LLP, by Robert McCuller Baldwin, D. Brian Allen, Monroe, for Appellant State of Louisiana DOTD.
*1112 Thomas Moore Hayes, III, Monroe, for Appellee.
Before STEWART, DREW and MOORE, JJ.
DREW, J.
From a judgment awarding damages to the family of the decedent in a single car crash, both the plaintiffs and a defendant, the Louisiana Department of Transportation and Development (DOTD), appealed. On November 13, 1999, Maudine Woods died when the vehicle she was driving eastbound on I-20 left the roadway, skidded for a distance and struck a concrete support column in the median of the interstate at the Britton Road overpass (location # 6081) in Ouachita Parish. Maudine Woods's husband, Donald Woods, and their three adult children sued DOTD and Arnold Construction Company (Arnold), which was under a contract with DOTD and in the process of replacing old guardrails along the interstate in Lincoln, Ouachita, and Richland Parishes. The old guardrails had been removed from location # 6081 on either October 25 or October 29,[1] and the new guardrail was installed on November 15, two days after the fatal accident.
The jury cast DOTD with paying the following damages to Mr. Woods:
 $710,000 for loss of love and companionship,
 $260,000 for loss of Mrs. Woods's earning capacity,
 $85,000 for Mrs. Woods's survival action (pre-impact fear), and
 $6,200 for Mrs. Woods's funeral expenses.
Mrs. Woods's three adult children were awarded $235,000 each for their loss. The jury reduced the total award by 40% for comparative fault assigned to Mrs. Woods and rejected plaintiffs' action against Arnold, which was dismissed with prejudice.
Following the denial of post-judgment motions, both the Woods family and DOTD appealed the trial judgment signed on May 28, 2002, as well as the judgment disposing of post-trial motions signed August 28, 2002. For the following reasons, the judgment is affirmed in part and reversed in part.

BACKGROUND AND TESTIMONY
Mrs. Woods's auto left the interstate at a narrow angle of five to seven degrees, traveled in a straight line across the asphalt shoulder into the median, and struck the concrete support column nearly 300 feet from her first skid marks on the asphalt. The column was just over 30 feet from the eastbound inside edge of the highway in a line drawn perpendicular from the column to the edge of the roadway. The interstate was marked with construction zone warning signs and cones to channel traffic. Warning barrels, signs, and barricades[2] marked the column itself. *1113 Her car struck on the front driver's side, sustaining heavy damage. The force of the collision was strong enough to rotate her car counter-clockwise. The experts estimated her speed at leaving the highway from 62 to 82 mph, and her speed at impact from 30 to 46 mph.
The investigating officers found no evidence of a blowout or any other reason for the vehicle to leave the road in what was described as a drift as opposed to a lurch. Photos in evidence show the day was clear and dry, and the interstate was straight. There were no visual obstructions of the overpass, the column, or the construction area which was clearly marked as a construction zone. One of the investigating state troopers recalled that on his way to the accident, he was aware of entering a construction zone because red and black construction warning signs were posted.
The north Louisiana portion of Interstate 20 was built in 1964. Since then, the record reflects that safety guidelines and equipment have continually evolved, as knowledge, experience, and technology improve. Apparently, and fortunately, this process is ongoing and continuous. This area of I-20 is no exception to the rule.
Consider:
 Guardrails were added to #6081 in 1967. These rails were straight installations without crash protection at the ends. Experts later determined that this type rail was a danger to the motoring public because the guardrail could actually pierce the passenger compartment if struck at a particular angle on the end.
 Installed in 1978 at # 6081, the next type of guardrail had a "turndown" at each end which curved over to the ground and which was anchored to the ground. Traffic engineers and others determined that, while an improvement over the early guardrails, if a car struck the turned-down portion of the rail under certain circumstances, the vehicle could become airborne or overturn. In the 1980s the federal government advised that turn-down guardrails should be upgraded.
 Arnold's work at location #6081 in 1999 included four distinct installations, two for the westbound lanes and two for the eastbound lanes. The interstate ran east and west. Just north of the westbound outside lane and just south of the eastbound outside lane, Arnold was to install pier (column) protection; i.e., concrete walls to shield the concrete piers (columns) located just north and south of the outside shoulders of the interstate. These piers (columns) supported portions of the Britton Road overpass which crossed over the interstate in a north/ south direction. In addition to removing the turn-down guardrails which ran parallel to the lanes of traffic and were located just north and south of the column (pier) in the center of the median, Arnold was to put new guardrails on the inside shoulders of the east and west bound lanes of the interstate.
Arnold removed the 1978 turned-down railing at the Britton Road overpass (# 6081). The rails were within a very few feet of the concrete column in the center of the median on both the eastbound and westbound sides of the interstate. Both rails north and south of the median column were turned down and secured together to an underground concrete anchor at the east and west ends of the installations.
The replacement guardrail at # 6081 was to be placed on new asphalt poured outside the old asphalt shoulder and was to be approximately 12 to 13 feet from the edge of the eastbound inside lane. The ends of the new guardrail were to be equipped with crash attenuators designed to slow a vehicle with the goal of protecting those passengers and other motorists.
*1114 A clear zone is the distance off the road which is considered sufficient for an errant driver to recover control of his vehicle and avoid damage to property or persons in vehicles or in the clear zone. Just outside the clear zone, the column in the median at location # 6081 was a bit over 30 feet from the outside edge of the eastbound roadway. Numerous witnesses confirmed this information.
Arnold began the project at the western point in Lincoln Parish and was proceeding east into Ouachita Parish. The DOTD project engineer overseeing this construction, Thomas M. Hill, testified:
 The Arnold contract provided that the contractor was restricted to working on no more than four locations at a time.
 The contract also required that no more than one lane of the highway be closed at a time, that there be no overnight closures, and that the contractor could not work the median and the outside of the highway at the same time.
 The contract required that Arnold submit a Construction Projection Schedule (CPS) on which Arnold projected three days each for dirt work, asphalt work, and installation of new rails at the accident site. According to the contract, any changes had to be filed with DOTD, and none were filed during the course of the project.
 The period of time between removal of the old guardrails and installation of the new was called the transition period.
 The contract did not set a number of days for which a guardrail could be down.
 Hill did not know of any regulation in the Louisiana Standard Specifications for Roads and Bridges (the Silver Book), MUTCD (a federal guide, Manual on Uniform Traffic Control Devices), or any other standard of conduct requiring Arnold to use temporary barriers during the transition period at Britton Road.
 At the request of Donnie Arnold, the contractor, Hill authorized Arnold to go beyond four locations and take down guardrails at four additional locations. Although almost certain he cleared this with his own boss, Hill acknowledged he could have made the decision on his own.
 Notwithstanding the Silver Book provision that neither the inspector nor the project engineer was authorized to waive or alter provisions of the contract, Hill stated he spoke for DOTD on the project and had authority to alter the sequence of work if he felt it was in the public interest and necessary to satisfactorily complete the work.
 Hill's authority included closing an unsafe construction site (a step he had taken with other contractors), but he never suspended Arnold's work at the accident site for unsafe conditions.
 Hill indicated that he had no evidence that taking down rails at the four extra locations delayed putting the rail up at the crash site "even for a day." In a seeming contradiction, he then said that removing guardrails at the extra four locations "probably" delayed putting up the guardrail where the accident took place. Hill later explained that he had not reviewed the project diary (a daily DOTD report of construction), had no knowledge of how many crews Arnold had and whether the take-down crew was the same group of workers who installed new guardrails. Hill acknowledged he did not know of and had no basis for stating there was a "probable" delay in *1115 placing the new guardrail at site # 6081.
 At the preconstruction meeting, Arnold was informed by DOTD that during the transition period, Arnold was required to use barrels and barricades at the support columns and to use cones and barrels on the roadway. Barrels, barricades, signs and cones did not protect motorists but served to warn oncoming drivers of the construction area.
 This contract did not call for any protective barriers or crash cushioning at any of the sites. Had DOTD wanted to use sand tubs or other protective devices, DOTD would have informed Arnold.
 The contract contained no time period for removal and installation of guardrails at any location.
 Hill did not direct Arnold to leave the old guardrail in place while the company installed the new guardrail. Hill had never seen that done in all his years of experience, and such a course of action would require a feasibility study.
 In his experience replacing guardrails, Hill had never seen temporary crash protection barriers used.
 Hill opined that Arnold was not in violation of its contract with DOTD and that Arnold's actions were all taken with his permission and authority.
Donnie Arnold, an owner of Arnold, testified that in addition to the contract itself, the company was bound to comply with the Silver Book, which included § 105.09 stating: "Except as permitted as instructed by the chief engineer, the project engineer is not authorized to alter or waive provisions of the contract."
Another provision of the Silver Book on which plaintiffs rely is § 107.07, which provides, in part:
The contractor shall conduct the work to assure the least possible obstruction to traffic. The project site and haul route shall be kept reasonably free from dust and in such condition that the public can travel in safety.
When the highway under construction is kept open to traffic, the sub-grade and surfacing shall be kept reasonably free from dust and in such condition that the public can travel in safety. Safety and convenience of the general public and the residents along with the work, and protection of persons and property, shall be the primary responsibility of the contractor....
Donnie Arnold also testified:
 He had been in construction many years and had concentrated on guardrail projects for the last seven years all over Louisiana and in Texas and Arkansas.
 In the CPS, Donnie Arnold estimated that it would take nine days to remove the old guardrails, do the dirt work, and install the new guardrails at the accident site (# 6081); the work actually took a day or two longer.
 The CPS submitted before work began was an estimate which showed the work on site # 6081 (Britton Road Overpass) was scheduled to be complete on the 108th or 111th day. In fact, the guardrail was in place on the 76th contract day.
 In July, August, and September, the work was proceeding satisfactorily, and Arnold received no complaints from DOTD about the timeliness of the job.
 Donnie Arnold wanted to keep his men working, and he believed he had the right to make the request to exceed four locations. The project engineer *1116 approved. Donnie Arnold understood he was authorized to take down a total of 22 individual guardrails at one time, with the understanding that Arnold would place the barricades, barrels, and lights as provided by the project engineer. Arnold had used different crews and subcontractors to perform specific jobs on the entire project.
 Arnold was not a traffic engineering firm, and at no time had DOTD required a traffic protection barrier for a structure 30 feet from the roadway. This concrete support column was 30'1" from the edge of the roadway.
 DOTD provides traffic engineering and there were no barriers in the plans and specification for the job. Arnold made no decisions as to where signs were placed. During the transition period before the new guardrail was in place, Arnold was required to and did place a Type III barricade, two lights and barrels to alert motorists to the column. In Arnold's work in Texas and Arkansas, no traffic engineer had ever required barriers or suggested that warning barricades, signs, and cones were insufficient.
 Arnold complied with the Silver Book regulation about signs, barricades and markers. Arnold violated no state law. Arnold had never been required to use temporary crash protection in its hundreds of guardrail projects.
 As a contractor, Donnie Arnold had to comply with annual continuing education requirements for licensed contractors. He had never been told to put up temporary protection during a guardrail project. Classes and industry literature instructed that warning devices be in place to warn motorists of the project.
A DOTD construction inspector, Danny Russell, was at the construction site daily where, using a copy of the contract, he verified that Arnold complied with the contract. Workdays were Monday through Friday, not including Saturday, Sunday, or any day that was too wet to work. According to his records, only one workday was too wet to work between October 21 and November 15. Russell reported that the entire job, which was supposed to take 150 days, actually required 152, because Arnold was assigned extra work to repair a damaged guardrail in Lincoln Parish. In his 17 years doing road work, Russell never heard of an old rail being left in place while a new one was installed. He had never seen a column guarded with anything but barricades, barrels, and cones (warning devices), which Arnold placed as directed by DOTD. Signs warning of a construction site went back 10 miles. He had never seen a cushion crash protection barrier used during construction to shield a column. When he left the crash site on November 12, the warning cones, barrels, barricades, and signs were in place.
An Arnold employee, Ray Moore, testified taking down more guardrails at additional locations did not increase the amount of time it took to construct the new guardrails. Contradicting Russell's records that the guardrails at the crash site were taken down October 25, Moore stated the rails at # 6081 were taken down October 29. An experienced worker on guardrail replacements, Moore worked as a superintendent and machine operator. In his experience, the average time from taking an old guardrail down and installing the new rail was 28 to 30 calendar days and 19 to 20 workdays. Moore described the 22 calendar days that the rail was down as average and noted that most did not get up that fast. Arnold put out signs, barricades, and cones to warn the motoring public about the construction. Moore stated the work on the extra four locations *1117 did not slow the project down at all. At # 6081, work was done on the outside pier protection during the time period between laying the asphalt (finished November 5) and installing the inside guardrail on November 15. Moore was certain that Arnold poured westbound pier protection concrete at the crash site on October 28; therefore, the crash site's old rail could not have been taken down until October 29. Moore also placed signs and cones according to the DOTD plans; in addition, he placed extra cones requested by DOTD. The contract initially did not call for barricades and barrels at the concrete columns in the median but DOTD directed that three barrels and a barricade be placed at median columns and Arnold complied. Moore disputed Russell's notations that the guardrail was removed at the crash site on October 25. Moore recalled they did not have time to put up the guardrail at the crash site on the day before the wreck because there was insufficient time before dark and Arnold was not permitted to work at night.
Plaintiffs' expert in traffic engineering and accident reconstruction, Dwayne T. Evans, stated:
 The center of the Woods vehicle did not strike the center of the column, which resulted in the vehicle moving counter-clockwise after impact.
 The barrels and a Type III barricade (boards painted orange and white) at the column were designed to warn motorists, not give crash protection.
 The decedent's vehicle traveled from the road to the column at a six-degree angle.
 Using measurements taken by the investigating trooper, Evans calculated that the average crush was 32 inches (distance the damage was pushed back toward the steering wheel).
 Woods's car was traveling approximately 61 to 63 mph at the beginning of her skid on the new asphalt and approximately 39 mph at impact.
 Had the new guardrail been in place, Mrs. Woods's car would have struck the guardrail in the new asphalt shoulder, damaged her car and the rail, and scraped along the guardrail until stopping. Had the old guardrail been in place, Evans speculated that the Woods vehicle would have struck the rail and been deflected away from the column.
 Evans stated water- or sand-filled barriers were available to protect the motorist from an unprotected column. According to Evans, if the old guardrail, the new guardrail or available crash cushions had been in use, Mrs. Woods would not have struck the column.
 The reasons for the accident are unknown, and Mrs. Woods might have been at fault in leaving the roadway.
 Mrs. Woods's path was more like a drift than a jerk of the steering wheel.
 No legal requirement, no federal regulation, and no ASHTO (American Association of State Highway and Transportation Officials) engineering guideline existed to his knowledge for when a temporary barrier should be placed by a roadway, and there is no instruction for temporary barriers during construction.
 DOTD provided Arnold extensive traffic engineering for the job, and whether to use temporary barriers or cushions to protect the column was an engineering decision.
 Arnold was "probably" justified in relying on DOTD and that Arnold could not second-guess DOTD's engineering decisions.
Testifying as an expert in accident reconstruction, Louisiana State Trooper *1118 James Richardson relied upon the measurements in the original state police accident report and performed his own speed calculations. Richardson concluded from the tests that Woods's vehicle was traveling from 23 to 30 mph when it struck the column. The investigation revealed no evidence of skid marks on the dirt and grass after the Woods vehicle left the asphalt. At the point on the new asphalt where the first skid marks were found, Richardson calculated Mrs. Woods's speed to have been a minimum of 57.4 mph. Richardson's opinion was that the vehicle was moving at the higher range of speed, that is, approximately 30 mph at impact and 65 or 66 as her skid began. The trooper opined the vehicle left the road due to driver error or driver condition, such as a medical problem or falling asleep.
Tendered as an expert in highway safety and guardrail systems and accepted by the trial court, Dr. Dean C. Albertson testified:
 No additional safety devices beyond those ordered by DOTD were necessary.
 The length of time which elapsed from removing the old guardrail until installing the new one was not unreasonable. The time period was short, and the old guardrail with rotten posts was a road hazard which needed to be removed.
 The column itself was over 30 feet from the roadway.
 There was no industry standard as to the number of locations on which a contractor should work at one time.
 The Britton Road overpass support column (# 6081) was not unreasonably dangerous.
 In 1999, Louisiana and hundreds of thousands of other interstate miles in the U.S.A. used a 30-foot set-back line so that all trees and signs are placed beyond 30 feet. The exception would be crash-worthy signs designed to break away on impact or signs protected by crash barriers.
 In construction zones, DOTD traffic engineering dictated the equipment and placement of barricades, signs, cones and construction zone warning signs during the transitional period between taking down an old guardrail and installation of the new one.
Hossein Ghara, a registered professional engineer and employee of DOTD, has jurisdiction over guardrail protection for median columns. In the late 1980s, the Federal Highway Commission advised that the old turn down guardrails should be replaced. The 30-foot clear zone was sufficient for a driver to bring an errant vehicle under control. Since this column was over 30 feet from the roadway, engineers did not introduce a barrier to protect the obstacle. During construction, no temporary barrier is required for a median column more than 30 feet off the roadway.
A retired Texas A & M professor, Dr. Michael James, who testified as an expert witness, had done accident reconstructions for almost 30 years. In contrast to the trooper reconstructionist who concluded decedent stopped braking when her car exited the asphalt, James concluded that the Woods vehicle was braking on the dirt halfway to the column, because the tire lines to the column were straight and there was no evidence of steering. James explained that a driver cannot steer when the brakes are locked. Had Mrs. Woods stopped braking, she could have steered the auto away from the column. Like the initial investigators, James found no evidence of tire failure. He concluded that Mrs. Woods's speed had been from 75 to 82 mph when she first began breaking, from 62 to 68 in the dirt, and from 43 to 46 at impact.
*1119 Using a different method of measurement, James found that the auto sustained about four feet of crush, as opposed to the trooper's estimation of about three feet of crush. He considered not only the damage to the front of the vehicle but also the overall compression of the car from front to back along with the bowing, the amount the front was bent to the left by the crash. The greater damage resulted in finding the higher speed. James concluded that, due to inattention, Mrs. Woods drifted off the roadway at a six- to seven-degree angle, panicked when she was about 300 feet from the column, and jammed on her brakes, which prevented her from steering away from the column. The expert acknowledged that Mrs. Woods's car would have struck the new guardrail had it been in place; however, he declined to speculate as to the outcome.
Accepted as an expert contractor in guardrail construction and rehabilitation, Thomas Irvin stated he was branch manager of United Rental Technologies, Inc., a national company that performs traffic control contracting and markets items such as guardrails, striping, and pavement markings. Irvin also taught concerning this type construction. Irvin stated:
 In his years of experience, no roadway owner, the State of Louisiana, or any municipality had ever required him to use an impact protective barrier for a column 30 feet from the roadway.
 The decision as to what protection should be used during construction is made by traffic engineering. If barriers are required by DOTD, that information goes out with the bid package so the contractor can include the cost.
 Irvin had never seen protection used for a column 30 feet from the roadway. Moreover, he had never taught or been taught that protective barriers were necessary for columns more than 30 feet from the roadway.
 He had been limited as to the number of locations he could work at one time, but had also consulted the project engineer and received permission to work more than the location limit in the contract. Irvin did not consider this a violation of the contract.
 His experience was that pier protection, which typically involved the outside lanes (like the Britton Road project), slowed guardrail removal and replacement.
 Ten working days between October 29, 1999, and November 15, 1999, was not an excessive or unreasonable amount of time to remove and replace the old guardrail.
 He had never seen a project in which the old guardrail was left up while the new one was installed.
 The clear zone in Louisiana was 30 feet, and he had always been instructed to park construction equipment at least 30 feet off the road.
 The work in this dispute was done quickly, systematically, and as he would have done it.
 He would not be concerned about the time period between removal of the old and installation of the new guardrail for a column more than 30 feet off the road.

DISCUSSION
In Cormier v. Comeaux, 1998-2378 (La.7/7/99), 748 So.2d 1123, the supreme court explained the standard of review for appellate courts examining the jury's findings of fact. Absent manifest error or clear wrong, the court of appeal may not set aside the jury's finding of fact. To reverse a jury's factual determinations, the appellate court must find (1) that a reasonable factual basis does not exist in *1120 the record for the jury's finding; and (2) that the record establishes that the finding is clearly wrong (manifestly erroneous). The reviewing court must do more than review the record for some evidence which supports or controverts the jury's finding. Instead, the appellate court must review the entire record to determine whether the jury's finding was clearly wrong or manifestly erroneous. The issue is not whether the jury was right or wrong, but whether the jury's conclusion was reasonable. Even if an appellate court concludes its own evaluations and inferences are more reasonable than the jury's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where testimony conflicts.
In order for a defendant to be held liable, the plaintiff must prove that (1) the DOTD had custody of the thing which caused plaintiffs' damages, (2) the thing was defective because it had a condition which created an unreasonable risk of harm, (3) the DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and (4) the defect was a cause-in-fact of plaintiffs' injuries.
The DOTD has a duty to maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence. This duty extends to the shoulders of highways as well. [DOTD's] duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself traveling on, or partially on, the shoulder. This duty extends to drivers who are slightly exceeding the speed limit or momentarily inattentive. As to the area off the shoulder of the road, but within the right of way, DOTD owes a duty to maintain the land in such a condition that it does not present an unreasonable risk of harm to motorists using the adjacent roadway or to others, such as pedestrians, who are using the area in a reasonably prudent manner.... Whether DOTD breached its duty, that is, whether the roadway at the scene of the accident was in an unreasonably dangerous condition, will depend on the facts and circumstances of the case.
Cormier at pp. 1126-1127. (Citations omitted.)
Although the supreme court discussed the liability of DOTD in the foregoing paragraph, the four-part test applies to any defendant. If the plaintiff fails to prove any one of the elements, the defendant is not liable. McGuire v. New Orleans City Park Imp. Ass'n, XXXX-XXXX (La.1/14/03), 835 So.2d 416.
The central issue presented is whether the concrete column, located in the median of the interstate, marked with warning barriers, warning signs, barrels, and cones, but not a crash protection barrier, created an unreasonable risk of harm. A finding that no reasonable factual basis exists on which the jury could have concluded that the column presented an unreasonable risk of harm pretermits the other issues raised on appeal. Fully cognizant of the jury's discretion as the finder of fact and the plaintiffs' devastating loss, we find, after an extensive review of the entire record, that the jury was clearly wrong and unreasonable in deciding that the plaintiffs proved that the concrete column more than 30 feet from the left edge of the roadway was unreasonably dangerous.
The jury correctly rejected plaintiffs' claims against Arnold. There was no proof that the extra locations delayed installation of the #6081 guardrail. All traffic engineering was strictly controlled by DOTD, which directed all the details down to the placement of all warning *1121 signs, barricades, and cones. Arnold complied with all DOTD directives. Both lay and expert witnesses testified the transition period between removal of the old and installation of the new guardrails was average for the industry and reasonable.
It is well-settled that DOTD has a non-delegable duty to maintain safe highways and shoulders. DOTD's standard of care in a highway area under construction is somewhat less than the standard required for a highway area not under construction. DOTD's duty is to exercise reasonable care to warn motorists of any dangerous conditions in a construction zone. Reasonable care requires that DOTD erect barricades, signs, and adequate warnings to alert the motoring public to extremely dangerous, trap-like hazards; unusual obstructions; perilous conditions; and road defects. Poland v. Glenn, 24,959 (La.App.2d Cir.8/18/93), 623 So.2d 227, writ denied, 93-2474 (La.12/2/93), 629 So.2d 1171.
In deciding whether a site presents an unreasonably dangerous condition, the court must weigh the magnitude and probability of injury against the burden of preventing the injury. Faulkner v. State, DOTD, 25,857 (La.App.2d Cir.10/26/94), 645 So.2d 268, writs denied, 94-2901 and 94-2908 (La.1/27/95), 649 So.2d 390. In Faulkner, teenagers entered an unopened portion of Interstate 49 by driving on an unmarked on-ramp and driving around three large concrete barriers marked with a "Road Closed" sign to enter the interstate. After driving on a portion of I-49 that was essentially complete, marked, and accepted by DOTD, plaintiffs drove onto an incomplete section, and at 60 mph drove off the end of the concrete road into a dirt embankment. DOTD's liability in Faulkner was based upon a finding of inadequate signing where the plaintiffs entered the interstate and was not based upon conditions where they drove off the road. The court found it would be an impossible burden for the state to warn unauthorized drivers of every possible danger in the unopened highway construction site.
DOTD's warnings must be sufficient to alert an ordinary, reasonable motorist, having in view the probable traffic, the character of the road and the reasonably anticipated use. DOTD must warn of any dangerous or potentially dangerous conditions in the construction zone. Lam v. State, DOTD, 495 So.2d 359 (La.App. 3rd Cir.1986), writ denied, 497 So.2d 1017 (La.1986). DOTD was not liable in Lam because the bump in the roadway where a railroad crossing was under repair was not an unreasonably dangerous condition. Although there was no bump warning sign, a DOTD employee testified the speed limit was 45 mph, and he had observed relatively heavy traffic pass the crossing with no difficulty.
Whether DOTD warnings are reasonable and adequate depends on location of the danger, the nature of the road and the general situation and circumstances. Dowden v. Mid-State Sand & Gravel, Inc., 95-231 (La.App. 3rd Cir.11/2/95), 664 So.2d 643; writ denied, 95-2864 (La.2/2/96), 666 So.2d 1099. DOTD's liability in Dowden was based upon DOTD's authorization for a contractor to ignore the required use of channeling devices, the absence of which caused the accident.
Plaintiffs rely on cases which hold that DOTD must protect drivers who inadvertently drive on the shoulder, one of DOTD's well-established duties. The cases are distinguishable. In Rue v. State, DOTD, 372 So.2d 1197 (La.1979), the plaintiff left the road for no apparent reason and drove onto the shoulder, where she struck a rut in the shoulder (admitted by DOTD to be dangerous), and lost control *1122 of her car. Noting that the purpose of the shoulder is to accommodate cars which intentionally or unintentionally drive thereon, the court found that an errant driver had the right to assume that the DOTD maintained the shoulder in a reasonably safe condition. Even if the plaintiff's conduct was substandard, she could recover from DOTD due to the negligently maintained shoulder. DOTD's liability in Rue was based on a defect which DOTD admitted was unreasonably dangerous condition.
Equally inapplicable is Campbell v. State, DOTD, 94-1052 (La.1/17/95), 648 So.2d 898, in which plaintiff went to sleep while operating the vehicle in the early morning hours and hit a bridge abutment for which guardrails had been recommended in two previous inspections. Moreover, other bridges on the same highway had been supplied with guardrails. DOTD shared the liability because it did not fulfill its duty of keeping the highway safe. The Campbell case involved an unreasonably dangerous condition which DOTD failed to remedy.
In Hunter v. State, DOTD, 93-0235 (La.1/1/95), 620 So.2d 1149, DOTD's liability was based upon the finding that a five-mile stretch of Highway 190, which had a four-foot wide median, was unreasonably dangerous to left-turning motorists.
In Petre v. State, DOTD, XXXX-XXXX (La.4/3/02), 817 So.2d 1107, an extremely intoxicated woman became distracted on a curvy road and drove her vehicle's wheels off the highway pavement. She tried unsuccessfully to turn back onto the highway and traveled along a roadside ditch until she hit a culvert and driveway perpendicular to the road. The culvert and driveway acted as a launching ramp which caused her vehicle to become airborne for some 122 feet. The vehicle hit two trees and overturned, resulting in injury to herself and death to her daughter. DOTD's share of liability was based upon the fact that the shoulder had only 18 inches of usable surface before it descended steeply into a ditch, an unreasonably dangerous condition. None of the cases was a construction site.
Even if we accept as true for the purposes of this case the testimony that had the new guardrail been in place, Mrs. Woods would have hit it, there is no liability if there is no unreasonably dangerous condition. Plaintiffs' arguments that DOTD allowed the guardrails to be down too long and failed to provide crash protection barriers is not supported by the record. All the testimony was that the work was done in an appropriate amount of time. Whether we consider the rail having been removed October 25 or October 29, the new guardrail was installed either 15 workdays or 11 workdays (not counting Saturdays, Sundays, and the one wet day on which no work could be done). Using the safety devices which plaintiffs argued should have been in place was unheard of in the industry either in practice or in the literature under the circumstances of this case.
The bottom line is that the clearly-marked column was not an unreasonably dangerous condition for an ordinary, reasonable motorist, even an errant one. Construction signs warning oncoming motorists of the construction were in place for several miles on the interstate. The testimony was that Mrs. Woods had traveled through the construction area driving west toward Shreveport when she remembered a forgotten item. She turned around and drove east to return to Winnsboro. Obviously, she had already seen the construction area that same morning.
Pursuant to DOTD's detailed instructions, Arnold had placed numerous barrels, *1123 cones, and signs to alert drivers to the construction area. Any reasonably attentive, albeit careless, driver could have very easily prepared for the difficulties of traversing the construction zone. The column itself was marked with high-visibility barrels, a barricade, and signs. Obviously, the interstate had very heavy traffic for which DOTD and Arnold prepared with sufficient warnings.
Since the column was over 30 feet from the outside edge of the roadway, the column was just outside the clear zone, the distance considered necessary for an errant driver to recover control and avoid an obstacle. Moreover, it was well-marked and readily apparent to motorists.
Unfortunately, the reason Mrs. Woods left the interstate is not known. She traversed almost the length of a football field (300 feet) before being killed by hitting the column. Whatever caused this digression from the roadway, the column was clearly visible from the interstate, the shoulder, and the median.
It is reasonable to expect inconvenience and some difficulty in passing through a construction area. Motorists have a right to be protected from unreasonable risks. The column, clearly marked with warning devices, was not an unreasonably dangerous condition. Even the most careless or an intoxicated driver should be able to recover sufficiently and steer away from the highly prominent column. Mrs. Woods did not have any type alcohol or other impairing substances in her system when she met her inexplicable death, which has devastated her family.

CONCLUSION
Based upon our review of this voluminous record, we find that the jury was clearly wrong in finding liability on the part of DOTD, for the foregoing reasons. On this record, it is not reasonable to find that the very visible and apparent column, marked with several warning devices, in a well-marked construction zone over 30 feet from the highway, and 300 feet from the point this poor lady started her drift, constituted an unreasonable risk of harm. Costs are assessed to the plaintiffs.
AFFIRMED IN PART AND REVERSED IN PART.
NOTES
[1] The daily log kept by the DOTD inspector stated that the guardrails at # 6081 were removed on October 25. The records were confusing as to this issue. The DOTD inspector had no independent recollection of when the rail was removed. Mr. Arnold and an Arnold employee testified that DOTD's October 25 entry was erroneous. Arnold did not complete the outside pier protection project until October 28. Since the contractor could not work simultaneously on the shoulder and the inside median, the guardrails at #6081 could not have been removed until October 29, in their view.
[2] In road construction nomenclature, a barricade is a brightly-painted wooden structure which is designed to warn, not protect, motorists. A barrier is a structure designed to serve as a crash attenuator to protect errant motorists. A pier is a support column. Pier protection is a concrete wall built to shield columns just off the shoulder of the road, in this case, on both outside lanes.